# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

TIMOTHY HARTNETT,

        Plaintiff,

vs.                                                                          No. CIV 10-1105 JB/CG

PAPA JOHN'S PIZZA USA, INC.,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Papa John's Motion for Summary Judgment Re: Plaintiff's Breach of Contract Claim, filed August 29, 2012 (Doc. 92)("MSJ"). The Court held a hearing on October 15, 2012. The primary issues are: (i) whether a reasonable jury could find that Defendant Papa John's Inc., by its words and conduct, modified an express at-will employment contract, and communicated to Plaintiff Timothy Hartnett that he would only be terminated for cause and in accordance with specified procedures; and (ii) whether, if an implied contract exists that modified the express contract, a genuine issue of material fact exists whether Papa John's terminated Hartnett in accordance with that implied contract. Because the Court concludes that genuine issues of material fact are present and evidence exists to support all of Hartnett's claims, the Court will deny Papa John's motion. The Court is not persuaded that Papa John's is entitled to judgment as a matter of law that no implied contract for employment exists that modified Hartnett's at-will status. Although Papa John's Management Agreement, filed August 29, 2012 (Doc. 92-3)("Management Agreement"), and Papa John's Corporate Restaurant Team Member Handbook, filed August 29, 2012 (Doc. 92-2)("Team Member Handbook"), expressly provide Hartnett's employment to be at-will, neither document disclaims the possibility of modifying

Hartnett's at-will status through either written or oral communications.  Additionally, Hartnett attended five mandatory training workshops, at which he was taught that certain procedures must be followed prior to terminating an employee in certain instances, and was taught that guidelines, including investigating circumstances and communicating with the investigated team member, should be followed in a termination process.  When Hartnett was promoted to a Director of Operations in 2003, he was told by a supervisor, Dan Braafhart, that he need not worry about leaving Papa John's, as long as Hartnett continued to perform and did not violate company policy or procedures.  Lastly, Hartnett received a memorandum from a supervisor who oversaw his own termination process, Memorandum from Rick Woods Re: People Policies, filed September 12, 2012 (Doc. 101-18)("Woods Memo."), which established mandatory policies and procedures that must be followed by Directors of Operations, such as Hartnett, and applied to the termination of management team members, such as Hartnett.  In light of the totality of Hartnett's relationship with Papa John's, the Court concludes that a reasonable jury could find that Hartnett could objectively and reasonably rely on Papa John's words and conduct for Hartnett's expectation that his employment would only be terminated for cause, and after certain procedures were followed.  Additionally, evidence exists to support Hartnett's contention that Papa John's lacked sufficient cause to terminate Hartnett, because the evidence Papa John's relied upon in terminating Hartnett may not be objectively reasonable.  Lastly, if an implied contract to follow certain procedures in terminating Hartnett was created, Hartnett has put forward evidence showing that Papa John's did not follow some procedures that could be part of that implied contract.  Accordingly, the Court denies Papa John's motion for summary judgment.

## FACTUAL BACKGROUND

The parties do not contest each other's facts.[1]  Papa John's hired Hartnett on August 17, 1998.  See MSJ ¶ 1, at 2.  Papa John's terminated Hartnett on October 17, 2007, at which time Papa John's employed him as a Senior Director of Operations.  See MSJ ¶¶ 2, 4, at 2.  Papa John's terminated Hartnett for falsifying company documents, in violation of Hartnett's responsibility to comply with Papa John's policies and procedures.  See MSJ at ¶¶ 3-4, at 2; Response ¶¶ 1-2, at 1 (citing Deposition of Robert Wesley Smith, taken May 16, 2012, filed Sept. 12, 2012 (Doc. 101-6)("Smith Deposition")).

### 1.    Hartnett's Management Agreement.

Hartnett's Management Agreement with Papa John's, signed on the day he was hired, provides:

> Notice to Employees.   This document does not grant, create or extend any contractual rights the above employee [sic] with respect to (i) such employee's current or future employment, or (ii) any benefits in connection with such employment.  The employee or the employer may sever the employment relationship at any time or for any reason at all.

Management Agreement, ¶ 6, at 1.  Hartnett signed the Management Agreement, affirming that the

---

[1]The parties do not dispute each other's facts in their respective motions.  Both Papa John's MSJ and Hartnett's Plaintiff's Response to Defendant's Motions for Summary Judgment, filed September 12, 2012 (Doc. 101)("Response"), contain sections of "Uncontested," or "Undisputed" material facts.  MSJ ¶¶ 1-18, at 2-5; Response ¶¶ 1-83, at 1-11.  Neither Hartnett's Response, nor Papa John's MSJ or Defendant Papa John's Reply in Support of its Motion for Summary Judgement Re: Plaintiff's Breach of Contract Claim, filed October 1, 2012 (Doc. 113)("Papa John's Reply"), contest the facts in the other's motion.  Compare MSJ ¶¶ 1-18, at 2-5, with Response ¶¶ 1-83, at 1-11 and Papa John's Reply at 1-10.  At the hearing on this motion, Papa John's informed the Court that it does not dispute Hartnett's facts, and assumes that Hartnett's facts will be uncontested at trial.  See Transcript of Hearing taken October 15, 2012 at 4:2-9 (Prynkiewicz)("Tr.")("[W]e didn't' contest the facts. . . they will be uncontested at trial at least from the facts that the plaintiffs put forward.  But always on summary judgment . . . I try to . . . assume that . . . that's the case and the facts you've said are the facts that you've said.").

contract was executed and delivered to him, and that he relied upon the agreement to explain his

"consideration [for] such employemnt" with Papa John's.  Management Agreement at 1.

### 2.    Papa John's Corporate Restaurant Team Member Handbook.

Papa John's Corporate Restaurant Team Member Handbook provides that:

> Neither this Code nor any of the policies described in this Code may be construed as an employment contract.  Papa John's does not create any contractual rights for any team member by issuing this code or other policies.

> Employment At Will

> Employment with Papa John's is entered into voluntarily.  Team members may resign at any time, for any reason, with or without notice.  Similarly, Papa John's is free to conclude the employment relationship at any time.

> Neither this handbook nor any of the provisions contained in the handbook can or should be construed as giving rise to any sort of contractual or legal obligation on the part of Papa John's.  This team member handbook supersedes all previous team member handbooks.  The effective date of this handbook is June 2006.[2]

MSJ ¶ 17, at 4-5 (citing Team Member Handbook").  Additionally, in the section of the handbook

titled "Standards of Conduct and Corrective Action," the handbook states:

---

[2]Neither party asserts as an undisputed fact that Hartnett received the Team Member Handbook, portions of which were submitted to the Court.  Papa John's cites to portions of Hartnett's Deposition where he indicates that is familiar with the Team Member Handbook.  See MSJ ¶ 17, at 4.  On the other hand, Hartnett testified that the Team Member Handbook submitted as evidence is not the handbook that he received when he was working at Papa John's.  He stated that the handbook he received differed, in that his copy did not have "the first two pages of notes." Hartnett Dep. at 56:6-12.  Hartnett stated that he did not receive a handbook in 2006, the effective date of the handbook in the record.  See Hartnett Dep. at 56:18-19.  Hartnett concedes, however, that he received a handbook, and has not contested any portions of the Team Member Handbook except for the first two pages of notes, which are not presented to the Court with the parties' respective motions.  See Tr. at 56:6-12, id. at 57:20-22.

The local rules establish that "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically converted." D.N.M.LR-Civ. 56.1(b).  Because Hartnett does not dispute that he received a team member handbook, and does not specifically contest the provisions in the Team Member Handbook submitted to the Court in his Response, the Court will not disregard the provisions of the Team Member Handbook submitted by the parties.

Violation of Papa John's standards of conduct in one of the following forms of corrective action [sic]: separation of employment, demotion, written warning, verbal warning, coaching or training.  In arriving at the appropriate decision for corrective action, the following will be considered:

■        the seriousness of the infraction;
■        the past work record fo the team member; and
■        the circumstances surrounding the matter.

Team Member Handbook at 4 (Doc. 101-9).  The Team Member Handbook then provides a "partial list of infractions which may result in corrective action up to and including separation of employment," after which the Team Member Handbook states: "This list is intended to be representative of the types of activities which may result in corrective action.  It is not intended to be comprehensive and does not alter the employment at-will relationship between the team member and Papa John's."  Team Member Handbook at 5 (Doc. 101-9).

###    3.    Dan Braafhart's Statements to Hartnett.

Hartnett believed, while employed with Papa John's, that his employment would not be terminated except for cause or under performance.  See MSJ ¶ 13, at 3 (citing Hartnett Depo. at 62:20-63:3).  This belief is based largely on a conversation Hartnett had with his then Regional Vice President, Dan Braafhart, in 2003, when Hartnett was given a promotion and asked to sign a Confidentiality and Non-Competition Agreement.  See MSJ ¶ 13, at 3 (citing Hartnett Depo. at 62:20-63:3); Response ¶ 5, at 2.  Hartnett was concerned about the terms of the agreement, and wanted more time to consider executing agreement, but Braafhart told Hartnett: "Don't worry about it.  As long as you perform, don't violate any policies and procedures, you'll be here forever."  MSJ ¶ 13, at 3 (citing Hartnett Depo. at 63:1-3); Response ¶¶ 4-5, at 2.[3]  Hartnett construed Braafhart's

---

[3]Papa John's contends that Braafhart's statements are hearsay and will be inadmissible at trial.  See MSJ n. 3, at 3.  However, Papa John's does not contest Hartnett's Deposition, upon which Hartnett relies in bringing forward Braafhart's statements.  See Response ¶¶ 4-5, at 2 (setting forth

statements to mean that he would always work for Papa John's, and thus Hartnett believed he did

not need to worry about any non-compete clauses, and on that belief Hartnett signed the agreement.

See MSJ ¶ 14, at 4; Response ¶ 6, at 2.

Hartnett's "Confidentiality and Non-Competition Agreement," with Papa John's, executed

in 2003, does refer to Hartnett's at-will employment status.   MSJ ¶ 18, at 5 (citing the

Confidentiality and Non-Competition Agreement, filed Aug. 29, 2012 (Doc. 92-5)("CNC

Agreement")).   The CNC Agreement generally required Hartnett to not work in the pizza industry

for eighteen months after leaving Papa John's.   See Response ¶ 3, at 1 (citing Hartnett Dep. at 62:22-

23).   The CNC Agreement states that signing executing the CNC Agreement is "a condition to the

employment of Employee."   CNC Agreement ¶ 4, at 3.

### 4.    The Managing Within the Law Workshops.

Hartnett believed, based on Papa John's internal program, "Managing Within the Law," he

---

fact of Braafhart's statements); Papa John's Reply at 1-11 (not contesting fact of Braafhart's
statements).  Because the local rules establish that "[a]ll material facts set forth in the Memorandum
will be deemed undisputed unless specifically converted," D.N.M.LR-Civ. 56.1(b), the Court will
deem Braafhart's statements as undisputed.  Moreover, in light of Papa John's admission at the
hearing that Papa John's does not contest Hartnett's facts, and that the Court may assume Hartnett's
facts as true for the purposes of this motion, the Court will accept Hartnett's facts regarding
Braafhart's statements as undisputed.  See Tr. at 4:2-9 (Prynkiewicz)("[W]e didn't contest the facts.
. . they will be uncontested at trial at least from the facts that the plaintiffs put forward.  But always
on summary judgment . . . I try to . . . assume that . . . that's the case and the facts you've said are
the facts that you've said.").

    Papa John's has filed a motion to exclude Braafhart's statements as hearsay.  See Papa
John's Motion in Limine re: Exclusion of Hearsay Testimony of Dan Braafhart, filed August 29,
2012 (Doc. 90)("Braafhart MIL").  At the hearing Papa John's stated that it did not believe
Braafhart's statements needed to be excluded for Papa John's to succeed on its MSJ.  See Tr. at
43:9-14 (Court, Prynkiewicz)(The Court inquired whether Papa John's "[does not] think you need
to keep this statement out to win your motion," and Papa John's replied, "[r]ight.").  Papa John's
also requested the Court to rule on its MSJ before ruling on the Braafhart MIL.  See Tr. at 71:17-
72:8 (Court, Fogel, Prynkiewicz)(The Court inquired in what order the parties would like the Court
to rule on the motions filed, and Hartnett and Papa John's agreed that the Court should rule on the
MSJ first, and then the Braafhart MIL).

would only be terminated for cause or under performance.  MSJ ¶ 15, at 4.  Managing Within the
Law is an annual workshop that Papa John's' human resources officers lead, and which Papa John's
requires its managers and officers to attend.  See Response ¶¶ 7, 9, at 2.  Hartnett attended the
workshop five times over the course of his employment with Papa John's.  See Response ¶ 8, at 2.
Hartnett received a participant's guide for the workshop.  See Response ¶ 10, at 2.  The human
resources officers at the workshops informed Hartnett that Papa John's primarily terminated
employees for violating company policy and poor performance, but did not give other reasons for
termination.  See Response ¶ 11, at 2 (citing Training Guide at 6, 22, Smith Dep. at 63:11-12).  Papa
John's human resources officer did not state during the Managing Within the Law seminar, nor did
the Training Guide state, that employment with Papa John's was at-will.  See Response ¶ 12, at 2-3
(citing Training Guide).  The human resources officers at Managing Within the Law did not state
that the policies and procedures in the workshop would supercede the Team Member Handbook.
See Response ¶ 13, at 3 (citing Training Guide).  Hartnett believed from Managing Within the Law
that he would receive due process if he were investigated for a violation of company policy; Hartnett
was told that due process meant that Papa John's follows a fair process when providing corrective
action.  See Response ¶ 14, at 3 (citing Training Guide at 2-4;Hartnett Dep. at 68:3-18, 69:19-25,
70:1-2).

Hartnett was told at Managing Within the Law that the three guidelines for due process are:
(i) act fairly; (ii) act consistently; and (iii) act legally.  See Response ¶ 15, at 3.  Hartnett was told
that to act fairly meant taking corrective action on legitimate, non-discriminatory reasons, taking
into account a team member's performance record and past infractions when determining the
appropriate corrective action, and determining if any circumstances beyond the team member's
control affected the team member's behavior.  See Response ¶ 15, at 3.  Hartnett was told that to act

consistently meant being consistent in applying corrective action, and ensuring that managers are not "coming down" especially hard on a team member because of personal dislike or discriminatory facts.  Response ¶ 15, at 3.  Hartnett was told that to act legally meant acting promptly after a violation occurs, documenting the infraction, ensuring that any corrective action is fair, and asking oneself whether a reasonable person could interpret the corrective action as retaliation or whether the corrective action fits the offense.  See Response ¶ 15, at 3.  Hartnett was taught at Managing Within the Law that Papa John's' company guidelines would be applied equally to all employees, and managers should not ignore infractions committed by team members whom the managers personally like.  See Response ¶ 16, at 3 (citing Training Guide at 6).  Managing Within the Law taught Hartnett that, before terminating an employee for violating a company policy, certain actions were to be taken, including: (i) gather facts, interview witnesses, determine if the employee knew of the policy violation, and investigate any extenuating circumstances; (ii) decide if separation from the company is appropriate by ensuring that termination will be consistent with treatment of employees in similar situations, and ensuring that termination is both legal and fair to the employee; and (iii) contact human resources or a superior to determine if they support terminating the employee.  See Response ¶ 17, at 4 (citing Training Guide at 22).  Managing Within the Law taught Hartnett that an objective standard -- "only a reasonably prudent man would approve the termination" -- would be used to determine if termination was proper.  See Response ¶ 19 (citing Training Guide at 3).  Hartnett believes, from Managing Within the Law, that after an investigation into an infraction was complete, human resources would thoroughly review the investigation before terminating an employee.  See Response ¶ 20, at 4.  Hartnett believes, from Managing Within the Law, that, Papa John's human resources would not approve a termination that did not conform with the steps provided in Managing Within the Law.  See Response ¶ 21, at 4 (citing Hartnett Dep. at

68:3-18, 69:17-25, 70:1-8).

The Training Guide from Managing Within the Law discusses "Due Process" at the beginning of the materials and provides three "Guidelines for Following Due Process." Training Guide at 5-6.[4] The Training Guide does not state that the guidelines are mandatory, but the speaker is directed to state: "Because it's important to be fair to team members, follow these guidelines." Training Guide at 5-7. The speaker is not directed to state that the guidelines are discretionary; however, the speaker is directed to state that the guidelines include:

- Informing team members of unsatisfactory performance as soon as possible
- Giving team members an opportunity to respond
- Developing a plan to improve the behavior
- Ensuring documentation outlines the consequences for continued unsatisfactory performance . . .
- Allowing team members a reasonable period of time to meet behavior or performance goals
- Following through on documented consequences

Training Guide at 5. Under the "Three Guidelines for Following Due Process" section, text purportedly from the "Participant's Guide," reads:

1. Act Fairly
   - Take corrective action based on legitimate, non-discriminatory business reasons.
   - Take into account a team member's performance record and prior infractions when determining corrective action.
   - Determine if any circumstances beyond the team member's control affected the team member's behavior.
   - Determine if the team member knew and understood the penalties for the rule violation.
   - Maintain perspective, don't treat minor infractions the same as

---

[4]Hartnett does not set forth the specific details of the Training Guide in his Uncontested Facts section, however, he does cite to the Training Guide generally. See Response ¶ 13, at 3. Because Papa John's has not contested Hartnett's facts, the Court deems the provisions of the Training Guide part of Hartnett's Unconstested Facts. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted.").

serious ones.

2.    Act Consistently
- Be consistent in applying corrective action when a rule or standard is violated.
- Handle the same or similar infractions in the same way.
- Ensure managers are "not coming down" especially hard on a team member because of personal dislike or discriminatory factors.
- Ensure managers are not "looking the other way" on infractions of team members they personally like.

3.    Act Legally
- Act promptly after a violation occurs, even if you're just giving a verbal warning.
- Document the infraction, when it happened, the corrective action taken and when corrective action was taken [sic] Document as appropriate (managers of company owned restaurant send in documents as needed). Franchise managers send in documents as is appropriate.
- Ensure corrective action is fair and consistent in terms of what's happened with other team members in the past.
- Ask whether a reasonable person could interpret your corrective action as retaliation for exercising legal rights.
- Ask whether a reasonable person could interpret your corrective action as discriminatory.
- Ask whether a reasonable person would feel your "corrective action" fits the "offense."

Training Guide at 5-6.

The Training Guide also contains a page labeled "Participant's Guide Text;" that is supposedly from the materials given to workshop attendees. Training Guide at 12. That page lists "Suggested Form of Corrective Action," and describes different corrective action that may be used, but does not contain any words indicating that a certain corrective action must, as a matter of established policy, be used to respond to a particular action. Training Guide at 12. In the section that apparently outlines group activities to be used during the workshop, one particular activity suggests that "separation" is the proper form of corrective action for an employee who calls an hour before her shift and states that she cannot report to work, after the manager has had documented

-10-

discussions with the employee in the past and the employee has not improved.  Training Guide at

13.   No further policies or procedures are discussed in this activity that must be taken before

choosing to separate the employee from Papa John's.  See Training Guide at 13.

      The Training Guide contains a section titled "Lecturette: Guidelines for Selecting Separation

from the Company as a Corrective Action."  Training Guide at 25.  Text is provided for the human

resources officer to read, stating: "There are two primary reasons we separate team members from

the company: for policy violations and poor performance . . . . Each has guidelines that *must* be

followed."  (emphasis added) Training Guide at 25.  In the section labeled "Participant's Guide

Text," three actions are listed "to take before separating team members from the company for policy

violations."  Training Guide at 25.

    1.    Gather the facts
- Interview team members and witnesses
- Determine if the team member knew of the policy violation
- Investigate extenuating circumstances

    2.    Decide if separation from the company is appropriate
- Ensure you are being consistent with other similar situations
- Ensure you are being fair to the team member
- Ensure you are being legal

    3.    Contact your resources
- Find out if your DO/OVP/OP supports separation from the company
- Find out if you HR support suggests separation from the company
- Seek help with your documentation

Training Guide at 25.  The following page lists five actions "to take before separating team members

form the company for performance," and provides similar, and more in depth steps, than the actions

to be taken before separating an employee for a violation of company policy.  Training Guide at 26.

      The Training Guide contains a section on "Separation Meetings."  Training Guide at 27-28.

The speaker is directed to discuss "Meeting Do's and Don'ts," on page 13 of the Participant's Guide,

the text of which is not included in the Training Guide.  Training Guide at 27.  The speaker is directed to discuss the "key ideas for conducting a separation meeting" with attendees.  Training Guide at 27.  "Suggested Answers" for the "key ideas" are listed, including:

- Conduct the meeting promptly and privately.
- Have a witness present.  The witness should be another manager or HR support person, not a peer of the team member being separated from the company.
- Explain the meeting's purpose.
- Provide a review of the violation or performance issue.
- Avoid making promises regarding benefits, another job, etc.
- Clearly state that the decision is final.
- Do not apologize as it often makes the situation worse.

Training Guide at 27.  Towards the end of the Training Guide, in the "Workshop Recap" section, the speaker is directed to ask what the "key points [are] to remember when conducting a separation meeting," and the "Suggested Answers" include: (i) "Remain calm;" (ii) "Get to the point;" and (iii) "Focus on behavior."  Training Guide at 30.

The end of the Training Guide contains questions for the speaker to ask the audience regarding an "effective separation meeting," and "[s]uggested answers."  Training Guide at 27.  The speaker was given text to say that HR support "can help you before your separation meeting," and "[w]hen in doubt, call your HR support."  Training Guide at 27.

In his deposition, Smith, as human resources director for Papa John's who has also taught Managing Within the Law, referred to Managing Within the Law as a "training workshop," and "not a policy."  Smith Dep. at 66:23-24.  Smith also testified that Papa John's terminates employees for poor performance and policy violations, "among other things."  Smith Dep. at 66:18-21.[5]

_____

[5]Neither party cites to the specific provisions of Smith's Deposition that the Court has included in this paragraph.  Hartnett does cite to other portions of Smith's Deposition in his Response.  See, e.g., Response ¶¶ 28-29, 32, 34-35, 40, 43 at 5-7.  Although the Court will construe all reasonable inferences in favor of Hartnett, as the non-moving party, the Court has also considers

5.    **Hartnett's Experience Working with Papa John's**.

Throughout the nine years that Papa John's employed Hartnett, Hartnett was required to comply with Papa John's policies regarding employee discipline, and he worked with Papa John's human resource department.  See Response ¶ 22, at 4-5.  Working with the human resources department confirmed to Hartnett what he had learned from Managing Within the Law.  See Response ¶ 23, at 5 (citing Hartnett Dep. at 67:19-25).  In general, a human resource officer would participate in the termination of an employee so as to ensure that the investigation was thorough and complete, and that good cause existed for the termination of the employee.  See Response ¶ 24, at 5 (citing Jackson Dep. at 42:3-10, 66:3-10, 66:18-25).  Human resources officers generally ensure that an operations manager seeking discipline is doing so for the right reasons, and a human resources officer generally seeks a legal opinion from the corporate legal division before termination of an employee.  See Response ¶¶ 26-27, at 5 (citing Smith Dep. at 80:1-16; Woods Memo. ¶ 3(c), at 1; Jackson Dep. at 176:11-13, 218:1-4).[6]  A human resources officer does not generally approve

_____

the portions of Hartnett's evidence, that Papa John's does not contest, in ruling on Papa John's MSJ.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted.");  Hunt v. Cromartie, 526 U.S. 541,550-55 (1999)(on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

[6]Hartnett alleges that human resources will "in general" seek an opinion from Papa John's legal department before terminating an employee, Response ¶ 27, at 5, but Jackson's Deposition, to which Hartnett cites, makes no mention of seeking a legal opinion before termination being a regular, or general practice, see Jackson Dep. at 176:11-13, 218:1-4.  However, Papa John's has not contested Hartnett's facts.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted.").  Because the Court must deem all undisputed facts admitted, the Court accepts Hartnett's facts regarding his experience working with Papa John's human resources department, and will construe all reasonable inferences that support his arguments in his favor.  See Hunt v. Cromartie, 526 U.S. 541,550-55 (1999)(on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

a termination if there was inadequate documentation, a vendetta between the operations manager and the employee, or if the employee did not know that a company policy was violated. <u>See</u> Response ¶ 28, at 5 (citing Smith Dep. at 80:17-19, Wood Memo. ¶ 3(c), at 1).[7]  A human resources officer would generally perform the investigation into the employee's infraction, or the investigation would be performed under a human resources officer's supervision. <u>See</u> Response ¶ 29, at 5 (citing Smith Dep. at 46:20-25, 47:1-6).  The person conducting the investigation would generally interview the employee and then have the employee write a statement consistent with the interview. <u>See</u> Response ¶ 31, at 6 (citing Hartnett Dep. at 69:17-25, 70:1-8; Jackson Dep. at 66:18-25).[8]

---

[7]Smith, the current human resources director, upon whose testimony Hartnett relies in this statement, testified at his deposition that human resources "would not allow a separation to go through if the facts didn't warrant it," but also stated that human resources "would typically review the facts regarding the decision to separate, but its not every separation," and their review depends "on the position of the person being separated." Smith Dep. at 74:6-8, 80:16-17, 78:13-16.  Hartnett also cites to the Woods Memo., which does not make any mention of the necessity of a human resources officer ensuring that a discipline contained proper documentation and was supported by the facts. <u>See</u> Woods Memo. ¶ 3(c) at 1. However, Papa John's has not contested Hartnett's facts. <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted."). Because the Court must deem all undisputed facts admitted, the Court accepts Hartnett's facts regarding his experience working with Papa John's human resources department, and will construe all reasonable inferences that support his arguments in his favor. <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541,550-55 (1999)(on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

[8]Hartnett sets forth the fact that, "[i]n general, the proper way to get a team member statement is for the investigator to interview the team member and then have the team member write a statement consistent with the interview," and relies upon his own experience, as well as Jackson's Deposition, in support of this fact. Response ¶ 31, at 6. Jackson testified that statements were taken when applicable, but that employees had been terminated in the past without being given a chance to present their side of the story. <u>See</u> Jackson Dep. at 42:11-13, 43:16-18. However, Papa John's has not contested Hartnett's facts. <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted."). Because the Court must deem all undisputed facts admitted, the Court accepts Hartnett's facts regarding his experience working with Papa John's human resources department, and will construe all reasonable inferences that support his arguments in his favor. <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. at 550-55 (on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

Employees are not terminated without good cause, and generally are not terminated unless a complete investigation shows how they violated a company policy or failed to perform.  See Response ¶¶ 25, 33, at 6, 7 (citing Jackson Dep. at 41:24-25, 42:1-10).[9]

Jackson testified that statements were not always taken from employees, but rather taking a statement from an employee prior to termination would "depend[] on the situation."  Jackson Dep. at 42:11-13.  On the other hand, Jackson testified that he could not recall a situation where an employee was terminated without being given coaching prior to termination, even if a statement was not taken from the employee prior to the employee's termination.  See Smith Dep. at 43:16-44:10.[10]

**6.     The Memorandum from Rick Woods.**

In paragraphs 25 and 28 of his facts, Hartnett cites to a Memorandum from Rick Woods, an Operations Vice President for Papa John's, dated February 15, 2005.  See Response ¶¶ 25-28, at 5

---

[9]Jackson states that employees are not normally just "fired for nothing," but will rather try to determine "what they did," Jackson Dep. at 42:7-10, Hartnett relies on this in stating that Papa John's "does not terminate team members with out good cause," Response ¶ 25, at 5, ¶ 33, at 6.  Papa John's has not contested Hartnett's facts.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted.").  Because the Court must deem all undisputed facts admitted, the Court accepts Hartnett's facts regarding his experience working with Papa John's human resources department, and will construe all reasonable inferences that support his arguments in his favor.  See Hunt v. Cromartie, 526 U.S. at 550-55 (on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

[10]Neither party cites to the specific provisions of Jackson's Deposition that the Court has included in this paragraph.  Hartnett does cite to other portions of Jackson's Deposition in his Response.  See, e.g., Response ¶¶ 24-25, 27, 31, at 5-6.  Although the Court will construe all reasonable inferences in favor of Hartnett, as the non-moving party, the Court also considers the portions of Hartnett's evidence, that Papa John's does not contest, in ruling on Papa John's MSJ.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted."); See Hunt v. Cromartie, 526 U.S. at 550-55 (on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

(citing to Ex. 18, Woods Memo.).[11]  The Woods Memo. states that it is regarding "People Policies," and that: "This memo serves as official communication on procedures for handling demotions, terminations, promotions, selection, and hiring of all management team members in Star Papa restaurants.  Some of these procedures are already in place, but all policies listed herein take effect immediately."  Woods Memo. at 1.  In the third paragraph, titled "Terminations," the Woods Memo. reads as follows:

    a.      Terminations of a [sic] salaried manager must be communicated to the OVP and PSD prior to communication to the team member[12]

———————————

[11]Hartnett does not use the Woods Memo. heavily in his Response.  The Woods Memo. is used in his Uncontested Facts section to support several propositions regarding the general practice of human resource officers when an employee is investigated for an offense that may lead to termination.  See Response ¶¶ 26, 28, at 5.  Hartnett does not allege that he received the Woods Memo. while employed as a Director of Operations, but he was a Director of Operations as of the date of the Memo.  Hartnett Dep. at 62:20-22 (Hartnett testifies that he was promoted to a director of operations in 2003).  He did testify that he believed Papa John's practices conflicted with the proposition that his employment was at will.  See Hartnett Dep. at 84:8-12.  Hartnett also testified that he "understood that [he] could expect to be employed as long as [he] did not underperform or violate any policies or procedure."  Hartnett Dep. at 85:10-13.

    Because the Court is moving on Papa John's motion for summary judgment, the Court is bound to construe all reasonable inferences in favor of Hartnett, the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55 (on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).  Additionally, all unconstested facts are deemed admitted.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically converted.").  Papa John's has not contested any aspect of the Woods Memo.  See Tr. at 4:2-9 (Prynkiewicz)("[W]e didn't' contest the facts. . . they will be uncontested at trial at least from the facts that the plaintiffs put forward.  But always on summary judgment . . . I try to . . . assume that . . . that's the case and the facts you've said are the facts that you've said.").  The Court thus infers that Hartnett received this memo, which was directed to "Star Papa Directors of Operations," while employed with Papa John's as a Director of Operations.  See Woods Memo. at 1.  The Court does not know what "Star Papa" refers to, and nothing in the record explains "Star Papa."  The Court infers that the terms of this letter were applicable to Hartnett's employment with Papa John's, as the Woods Memo. is signed by Hartnett's supervisor, Rick Thompson, who ultimately oversaw Hartnett's termination.  See Woods Memo. at 1, 3.

    [12]The Woods Memo. and Hartnett's briefing do not define the acronyms "OVP" and "PSD."  The Incident Report, however, lists Rick Thompson as the "OVP," and Laura Jackson as the "People Services Dir."  Incident Report at 1.  The Court concludes that OVP refers to an "Operations Vice

      b.      Termination must be preceded by documented coaching and action plan to correct the performance issues (reviewed by PSD prior to termination) Exceptions to this include theft, manipulation, harassment, etc [sic]

      c.      All pertinent company policies must be followed during the termination process (PSD is resource for ensuring compliance to all policies)

Woods Memo. ¶ 3, at 1.[13]  The Woods Memo. does not address the at-will nature of any managerial employee's relationship with Papa John's.  See Woods Memo.  The Woods Memo. contains sections with provisions regarding demotions, promotions, selection and hiring, salary administration, salaried managerial scheduling, as well as the section on termination.  See Woods Memo. at 1-3.

**7.**      **Papa John's Termination of Hartnett.**

The false reporting incident that led to Hartnett's termination began when Hartnett reported a work-related accident to Rick Thompson, Vice President of Operations for Papa John's, on August 14, 2007.  See Response ¶ 39, at 7 (citing Hartnett Dep. at 116:1-12).  Thompson did not turn Hartnett's workers' compensation claim over to insurance, as Papa John's company policy requires him to do.  See Response ¶ 40, at 7 (citing Smith Dep. at 28:15-25, 29:1-17, 50:19-25, 51:1-4).  On October 2, 2007, Hartnett informed Laura Jackson, who works in Papa John's human resources

---

President," and PSD refers to a People Services Director.

    [13]Because the Woods Memo. is directed to all director of operations, the Court infers that Hartnett received the Woods Memo. while working as a Senior Director of Operations, although Hartnett has not specifically alleged this fact.  Compare Woods Memo. at 1 (indicating a sent date of February 15, 2005), with Hartnett Dep. at 62:20-22 (Hartnett testifies that he was promoted to a director of operations in 2003), and Team Member Meeting Confirmation, filed Sept. 12, 2012 (Doc. 101-19)(stating that Hartnett was a Senior Director of Operations when terminated).  See also Hunt v. Cromartie, 526 U.S. at 550-55 (on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).  Additionally, because Hartnett was hired as a manager, see Management Agreement at 1, and was terminated while still in a supervisory position, see Affidavit of Timothy Hartnett, executed September 12, 2012, filed September 12, 2012 (Doc. 101-20), the Court infers that the Woods Memo. would have applied to Hartnett's termination, as the Woods Memo. "serves as official communication on procedures for handling demotions, terminations, promotions . . . of all management team members . . . . ," Woods Memo. ¶ 1, at 1.

-17-

department, that he would be unable to attend the management inventory meeting scheduled for October 10 and 12, 2007, because of the injury he suffered at work.  See Response ¶ 41, at 7 (citing Deposition of Laura Jackson at 135:11-23, taken June 10, 2009, filed Sept. 29, 2012, (Doc. 101-1)("Jackson Dep.")).   At the management inventory meeting, Papa John's upper management inquired whether Hartnett's injury was work related; immediately following the meeting, Thompson initiated an investigation of Hartnett.  See Response ¶¶ 42, 44, at 7 (citing Deposition of Rick Thompson at 48:21-25, 1-23, taken June 10, 2009, filed Sept. 12, 2012 (Doc. 101-2)("Thompson Dep."); Corporate Incident Report re: Timothy Hartnett, filed Sept. 12, 2012 (Doc. 101-21)("Incident Report").  Hartnett was not interviewed as part of the investigation.  See Response ¶ 46, at 7 (citing Thompson Dep. at 93:7-25).  Thompson emailed Hartnett several months prior to commencing the investigation, and expressed concern about the number of stores Hartnett was visiting each day, but no further communication with Hartnett was made before his termination.  See Incident Report at 1-2.  The other employees interviewed were asked to recall, between twenty-four and twenty-eight days after the fact, whether they had seen Hartnett on September 22, 2007.  See Response ¶ 45, at 7 (citing Letter of Megan Herren, filed Sept. 12, 2012 (Doc. 101-14)("Herren Letter'); Letter of David Montoya, filed Sept. 12, 2012 (Doc. 101-15)("Montoya Letter").  Thompson collected statements from two store managers at the stores that Hartnett visited as part of his of his supervisory duties, and these managers gathered statements from their employees regarding whether Hartnett visited their stores on September 22, 2007.  See Response ¶¶ 47-48, at 7 (citing Incident Report; Jackson Dep. at 48:14-25).  Having the store managers collect statements from their employees was not normal; investigators normally interviewed the employees personally and had the employees write a statement consistent with the interview.  See Response ¶ 31 at 6, ¶ 48, at 7 (citing Incident Report; Hartnett Dep. at 69:17-25; Jackson Dep. at 48:14-25, 66:18-25).

Thompson did not obtain a statement from an employee named Cody, a manager-in-training at one of the stores Hartnett was to visit on September 22, 2007, who closed the store in lieu of the manager from whom Thompson obtained a statement. See Response ¶¶ 55-57, at 8 (citing Deposition of Benny Trujillo at 20:1-23, 93:18-25, 94:1-4, 10-20, taken June 12, 2009, filed Sept. 12, 2012 (Doc. 101-5)("Trujillo Dep.")). According to Benny Trujillo, the manager at one of the stores Hartnett was to visit on September 22, 2007, Thompson told Trujillo that "[Hartnett] is on his way out . . . so I need a statement from you." Response ¶ 60, at 8-9 (quoting Trujillo Dep. at 15:20-25, 16:1-9). Thompson concluded, after obtaining statements from store managers and employees at three of the five restaurants Hartnett was to visit, that Hartnett had falsified mileage accounts on his expense reports for September, 2007 expenses. See MSJ ¶¶ 3, 4, 7-8, at 2-3; Response ¶ 64, at 9 (citing Thompson Dep. at 43:8-16). Papa John's had no written policy regarding a required method to fill out the form for mileage reimbursement on expense reports. See Response ¶ 34, at 6.

Papa John's expects its employees to conduct themselves in an honest and ethical manner during their employment. See MSJ ¶ 9, at 3. Hartnett understood that violating Papa John's code of ethics and business conduct policy could result in an employee's termination, and that any falsification of a report for Papa John's could result in the employee's termination. See MSJ ¶ 10-11, at 3. Hartnett believed Papa John's would not terminate an employee's employment unless it was for cause, or under performance, a belief which Hartnett's long tenure with Papa John's affirmed. See MSJ ¶ 12, at 3 (citing Deposition of Timothy Hartnett, at 67:15-24; id. at 85:5-13, taken May 31, 2012, filed Aug, 29, 2012 (Doc. 92-1)). Hartnett was trained to fill out mileage reimbursement forms in a different method than that of other Papa John's' employees. See Response ¶ 35, at 6. Jackson, a Papa John's' human resources "expert," did not participate in the

-19-

investigation, and her lack of participation is inconsistent with company policy.  Response ¶¶ 51-53, at 8 (citing Jackson Dep. at 91:15-18, 91:22-24, 107:24-25, 108:1-4).[14]  Jackson later admitted that the statements taken from one of the stores were faulty and unusable.  See Response ¶ 65, at 9 (citing Jackson Dep. at 216:11-13).  Jackson also informed other human resources employees that she had obtained statements from all the stores, when she did had not.  See Response ¶ 67, at 9 (citing Herren Letter at 1; Montoya Letter at 1; Jackson Dep. at 107:14-16, 108:1-4).

Hartnett's termination was approved by the director of human resources, Robert Wesley Smith, who had not reviewed the investigation and documents submitted by Jackson, another human resources officer.  See Response ¶ 68, at 9 (citing Smith Dep. at 39:9-24).  The human resources employee who approved Hartnett's termination did not know that he had been injured in a work-related accident, and was only performing light duty.  See Response ¶¶ 69-70, at 9-10 (citing Smith Dep. at 31:17-25, 32:1-8).  The human resources employee who approved Hartnett's termination did not have knowledge of Hartnett's past, including his "experience, his integrity, and his credentials."  Response ¶ 71, at 10 (citing Smith Dep. at 33:10-14).  Hartnett was terminated at a Wendy's restaurant patio, during the afternoon of October 17, 2007.  See Response ¶ 74, at 10 (citing Managing Within the Law, Training Guide at 20, filed September 12, 2012 (Doc. 101-7)("Training Guide"); Jackson Dep. at 85:1-25, 87:4-15).

After his termination, Hartnett found a store inspection form from one of the stores he visited on September 22, 2007, which he submitted to Jackson.  See Response ¶¶ 77-78, at 10 (citing

---

[14]Hartnett does not define the meaning of a "human resources expert," but Papa John's does not contest this fact.  Because the local rules establish that "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically converted," D.N.M.LR-Civ. 56.1(b), the Court will deem all facts in the parties' motions as undisputed.  Jackson testified that she would hold herself "out as an expert in regard to investigating employee misconduct . . . . [a]nd in regard to collecting and gathering information."  Jackson Dep. at 91:19-22.

Jackson Dep. at 110:1-25).  Thompson then contacted store managers who had previously given

statements to determine if Hartnett in fact conducted a store inspection on September 22, 2007.  See

Response ¶ 79, at 10 (citing Jackson Dep. at 54:11-25, 55:1-21).  Additionally, Thompson directed

a store manger to visit the hotel in Los Lunas, New Mexico, to determine if Hartnett had stayed at

the hotel on September 22, 2007.  See Response ¶ 80, at 11 (citing Thompson Dep. at 89:1-25; id.

at 90-92).

## PROCEDURAL BACKGROUND

On October 8, 2010, Hartnett filed a complaint in the Second Judicial District, County of

Bernalillo, State of New Mexico.  See Complaint for Damages for Wrongful Termination,

Retaliatory Discharge, Defamation of Character, and Punitive Damages, filed in State Court Oct.

8, 2010, filed in federal court Nov. 19, 2010 (Doc. 1-1).  On November 19, 2010, Papa John's

removed the action, pursuant to 28 U.S.C. § 1441(a) and 1446 to the United States District Court

for the District of New Mexico.  See Defendant's Notice of Removal at 1, filed November 19, 2010

(Doc. 1).  On March 9, 2011, Hartnett filed an Amended Complaint for Damages for Breach of an

Implied Contract, Retaliatory Discharge, Defamation of Character, and Punitive Damages (Doc.

25)("Amended Complaint"), alleging: (i) breach of an implied contract of employment and breach

of the implied covenant of good faith and fair dealing; (ii) retaliatory discharge; and (iii) defamation.

See Amended Complaint ¶¶ 3-4, at 2.

Hartnett filed a Motion for Summary Judgment on May 25, 2011 (Doc. 29), and Papa John's

filed a Cross Motion for Summary Judgment on June 14, 2011 (Doc. 33).  See Memorandum

Opinion and Order, filed October 7, 2011 (Doc. 47)("MOO").  On October 7, 2011, the Court: (i)

granted in part Hartnett's Motion for Summary Judgment and precluded the parties from relitigating

the existence of good cause; and (ii) granted Papa John's Cross-Motion for Summary Judgment and

dismissed the retaliatory discharge claim with prejudice.  See MOO at 1-2.  The remaining claims after this point were Hartnett's allegation of breach of an implied contract for employment and good faith and fair dealing, and for defamation.  See MOO at 11, 14-16.  Within days of filing this motion for summary judgment, Papa John's filed a stipulation to dismiss Hartnett's defamation claim.  See Stipulation to Dismiss Plaintiff's Defamation Claim at 1, filed Aug. 31, 2012 (Doc. 93).

Papa John's moves the Court, pursuant to rules 54(b) and 56 of the Federal Rules of Civil Procedure, and D.N.M. LR-Civ 56.1(d), for summary judgment in its favor and against Hartnett on its breach of implied contract claim.  See MSJ at 1.  Papa John's asserts that there is no genuine issue of material fact and that Papa John's is entitled to judgment as a matter of law.  See MSJ at 1.  Papa John's asserts that, under New Mexico law, employment is terminable at will unless an express contract exists to the contrary.  See MSJ at 5 (citing Gromley v. Coca-Cola Enters., 130 N.M. 128, 134, 85 P.3d 252, 258-59 (Ct. App. 2003)(internal citations omitted)).  Papa John's admits that there is an exception to this general rule when an implied contract limits the employer's authority to terminate the employment.  See MSJ at 5 (citing Lopez v. Kline, 124 N.M. 539, 541, 953 P.2d 304, 306 (Ct. App. 1997)).  Papa John's asserts that the Supreme Court of New Mexico has found an implied contract restricting an employer's ability to terminate an employee where: (i) "the employer makes a direct or indirect reference that termination would be only for just cause;" or  (ii) "the employer has established procedures for termination that include elements such as [a] probationary period, warnings for certain proscribed conduct, or procedures for employees to express their grievances."  MSJ at 5 (citing Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)).  Papa John's asserts that the existence of an implied contract is a question of fact, which should be determined by a totality of the parties' relationship, and the circumstances and objective thereof.  See MSJ at 5 (citing Newberry v. Allied Stores, Inc., 108 N.M. 424, 427, 773

P.2d 1231, 1234 (1989)(internal citations omitted).

Papa John's contends that, when determining if an implied contract for employment exists, the "ultimate question is whether the employer, by sufficiently specific words or conduct, has created in the employee a 'reasonable expectation' of job security."  MSJ at 6 (quoting Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783).  Papa John's argues that the reasonableness of any expectation is measured by how definite, specific, or explicit the employer's representation or conduct was.  Papa John's states that the representations may be written, oral, or a combination, but an oral representation must be sufficiently explicit and definite to create the implied contract.  See MSJ at 6 (citing Newberry v. Allied Stores, Inc., 108 N.M. at 427-28, 773 P.2d at 1382; Garrity v. Overland Sheepskin Co. of Taos, 121 N.M. 710, 713-14, 917 P.2d 1382, 1385-86 (1996)).

Papa John's argues that no implied contract exists in this case.  Papa John's argues that Hartnett's belief that he had an implied contract is in "direct contrast to the language in his management contract and the Handbook."  MSJ at 7.  Papa John's argues that Hartnett cannot rely on his long tenure with Papa John's as evidence that an implied contract existed.  Papa John's contends that the Supreme Court of New Mexico has ruled that reliance upon a long tenure of employment, or an employer's practice of only firing for-cause, is insufficient to create an implied contract that termination would only be for-cause.  See MSJ at 7 (citing Hartbarger v.  Frank Paxton Co., 115 N.M. at 674, 857 P.2d at 785).  Papa John's contends that Hartnett's reliance on statements that Braafhart made, in the context of Hartnett receiving a promotion and voicing concerns about the non-competition agreement, is misplaced under New Mexico law, as Braafhart was only responding to Hartnett's concerns and not expressing the terms of a contractual promise.  See MSJ at 8 (citing Hartbarger v. Frank Paxton Co., 115 N.M. at 674, 857 P.2d at 785).

Papa John's also contends that, even if an implied contract existed, Papa John's was justified

under New Mexico law in terminating Hartnett.  See MSJ at 8-9 (citing N.M.R.A., UJI 13-2306 (1999)).  Papa John's argues that Hartnett was terminated for having falsified company documents -- specifically, the mileage on an expense report Hartnett submitted for September expenses.  See MSJ at 9.  Papa John's asserts that Hartnett understood that he was expected by Papa John's to conduct himself in an honest and ethical manner during his employment.  See MSJ at 6.  Papa John's asserts that Hartnett understood that falsifying any report for Papa John's could result in his termination.  See MSJ at 6.  Papa John's argues that Hartnett's supervisor, Thompson, investigated Hartnett's expense reports in conjunction with Jackson, from Papa John's' human resources department.  See MSJ at 9.  Papa John's asserts that Jackson's Incident Report on Hartnett concluded that Hartnett had falsified the mileage on his September expense report.  See MSJ at 9-10.  Papa John's argues that falsifying mileage is an offense that warrants immediate termination, and Hartnett knew these consequences would occur.  Papa John's thus argues that it had cause to terminate Hartnett, and thus Hartnett's termination was within the terms of his employment agreement even if an implied contract existed.  See MSJ at 10.

Hartnett agrees that New Mexico law provides for employment to be at will, unless an implied contract is created either by the employer expressing that termination will only be for cause, or by the employer providing procedural protection before termination.  See Response at 11 (citing West v. Washington Tru Solutions LLC, 147 N.M. 424, 224 P.3d 651 (Ct. App. 2009)).  Hartnett argues that, even though statements within the Handbook disclaim the existence of any specific employment contract between Papa John's and its employees, the totality of Papa John's statements and actions -- not a personnel manual alone -- determine whether a contractual obligation exists. See Response at 11-12 (citing McGinnis v. Honeywell, Inc., 110 N.M. 1, 5-6, 791 P.2d 452, 456-57 (1990); Kiedrowski . Citizens Bank, 119 N.M. 572, 575, 893 P.2d 468, 471 (Ct. App. 1995)).

Hartnett contends that "any" statements made by an employer may be sufficient to create an implied contract that employment is terminable for cause only.  See Response at 12 (citing Kestenbaum v. Pennzoil, Co., 108 N.M. 20, 766 P.2d 280 (1988)).  Hartnett argues that Braafhart's statements to Hartnett when he signed the CNC Agreement, as well as the Managing Within the Law workshops, constitute an agreement not to discharge Hartnett other than for good cause, for a violation of company policy, or for poor performance.  See Response at 12-13.  Hartnett's argues that Jackson's statements at her deposition support the existence of an implied contract that Hartnett would not be terminated except for cause.  See Response at 13.

Hartnett also argues that he and Papa John's had an implied agreement to follow particular procedures in discharging him.  See Response at 13.  Hartnett asserts that the Managing Within the Law workshops informed Hartnett that, when investigating a supposed infraction, following an interview, an investigator would take statements from team members directly -- an understanding that Hartnett asserts Jackson's statements supports.  See Response at 13-14.  Hartnett contends that Managing Within the Law taught him that any investigation would be conducted in confidence, a term of the alleged agreement that Hartnett argues was broken by Papa John's communications with other managers in Hartnett's termination process.  See Response at 14-15.  Hartnett also contends that the reasonableness of his termination is a question for a jury to decide, as "there are multiple issues which raise an issue of whether or not a reasonable man would have terminated Mr. Hartnett." Response at 15.

Papa John's responds that, even accepting Hartnett's testimony as true, in light of Hartnett's Management Agreement and the Handbook, Hartnett cannot establish, as a matter of law, that "he had an objectively reasonable expectation that Papa John's could only fire him for cause or only after following certain procedures."  Papa John's Reply at 1-2.  Papa John's contends that the Court

must "begin with the proposition that employment without a definite term is presumed to be at will." Papa John's Reply at 2 (internal alterations omitted)(quoting Trujillo v. N. Rio Arriba Elec. Coop., 131 N.M. 607, 615-16, 41 P.2d 333, 341-42 (2001)).  Papa John's again asserts that the Court must determine whether "a reasonable jury could find that Papa John's words and conduct support an objectively reasonable expectation that its employees will be dismissed only in accordance with specified procedures and for specified reasons."  Papa John's Reply at 3 (quoting West v. Washington Tr. Solutions, LLC, 147 N.M. at 426 224 P.3d at 653).

In support of its argument that Hartnett's employment with Papa John's was mutually at will, Papa John's points to the Management Agreement which Hartnett signed the first day he was hired. The Management Agreement states that it does not "grant, create, or extend any contractual right . . . to [Hartnett's] current or future employment," and that Papa John's "may sever the employment relationship at any time for any reason at all."  Papa John's Reply at 3 (quoting Management Agreement).  Papa John's also points to the Handbook, which contains a section entitled "Employment At Will," which states that employees "may resign at any time, for any reason, with or without notice," and that Papa John's "is free to conclude the employment relationship at any time."  Papa John's Reply at 3-4.

Papa John's argues that Hartnett's at-will status was never altered.  Papa John's contends that the authority upon which Hartnett relies in his Response discusses an implied contract where a contract that provides for employment at will also qualified the circumstances under which an employee could be terminated.  See Papa John's Reply at 4-5 (discussing McGinnis v. Honeywell, Inc., 110 N.M. at 6, 791 P.2d at 457).  Papa John's contends that Hartnett's employment contract is unambiguous in its language that Hartnett's employment is at will only, and that there are not qualifying procedures which must be followed before Papa John's was able to terminate Hartnett.

-26-

See Papa John's Reply at 5.  Papa John's contends once again that Hartnett's reliance on any statements that Braafhart made when Hartnett executed the CNC Agreement is misplaced -- Papa John's contends that the Supreme Court of New Mexico has rejected the possibility that such statements are sufficient to create an implied contract of employment.  See Papa John's Reply at 6 (citing Hartbarger v. Frank Paxton Co., 115 N.M. at 674, 857 P.2d at 785).  Papa John's contends that a reasonable person would not construe such statements to create an implied employment contract, and thus there is no basis for a reasonable jury to conclude that Braafhart's alleged statement was sufficiently explicit, specific, or definite enough to alter the at-will presumption.  See Papa John's Reply at 7.  Additionally, Papa John's argues that Hartnett's reliance on the Managing Within the Law workshops as a basis for his supposedly implied contract for employment is insufficient: Papa John's contends that Hartnett does not state that anyone ever told Hartnett that Papa John's could not terminate an employee without good cause or without complying with certain procedures.  See Papa John's Reply at 7.  Papa John's asserts that any information the instructors at Managing Within the Law gave Hartnett regarding the termination policies did not purport to be the exclusive methods or reasons which may lead to an employee's termination.  See Papa John's Reply at 7.  Papa John's further contends that having a "track record of only terminating employees for certain reasons does not mean that an employer has surrendered its right to terminate at will." Papa John's Reply at 8 (citing Zarr v. Washington Tru Solutions, LLC, 146 N.M. 274,  279, 208 P.3d 919, 924 (Ct. App. 2009)).  Papa John's thus argues that the "general approach" discussed in the Managing Within the Law workshops were not definite, specific, or explicit statements that could create a reasonable expectation that Papa John's would terminate an employee only for good cause and after following certain procedures.  See Papa John's Reply at 8.

Papa John's further re-states its argument that it did not violate any implied contract in

terminating Hartnett's employment.  <u>See</u> Papa John's Reply at 9.  Papa John's once again argues that Hartnett violated a company policy by falsifying the mileage on his expense report, an infraction which warrants termination.  <u>See</u> Papa John's Reply at 9.  Papa John's asserts that Hartnett knew such an infraction would lead to termination.  <u>See</u> Papa John's Reply at 9.

The Court held a hearing on this motion on October 15, 2012.  At the outset, the Court inquired of Papa John's whether the facts are uncontested, as neither party indicated any disputes to the other party's facts in their respective briefings on the MSJ.  <u>See</u> Tr. at 3:16-4:1 (Court).  Papa John's replied that it did not contest Hartnett's facts -- Papa John's does "[not] think it matters."  Tr. at 4:2-4 (Prynkiewicz).  Papa John's stated that the facts "will be uncontested at trial, at least from the facts that the plaintiff put forward."  Tr. at 4:4-6 (Prynkiewicz).  Papa John's stated that on a summary judgment motion, it always assumes that the Court will accept the plaintiff's facts as true. Tr. at 4:6-9 (Prynkiewicz).  Papa John's stated: "[W]e didn't contest the facts because we don't think it matters . . . because they're uncontes[ed] and they will be uncontested at trial at least from the facts that the plaintiffs put forward."  Tr. at 4: 3-6 (Prynkiewicz).  Papa John's stated that, even "assuming [Hartnett's facts are] true, as we do for purposes of this motion, individually or collectively [they] are not enough to create a triable issue."  Tr. at 5:2-5 (Prynkiewicz).

Papa John's then asserted that there is "no evidence before the Court that there was any promise, in terms of a specific length of time or a definite term," and Papa John's employment "is presumed to be at will."  Tr. at 3:5-9 (Prynkiewicz).  Papa John's pointed to the Management Agreement, which Hartnett asserted is an "express contract between Plaintiff and Papa John's," that provides that Papa John's will hire Hartnett to supervise and oversee several restaurants in exchange for Hartnett agreeing to the terms of the agreement.  Tr. at 3:10-15 (Prynkiewicz).

The Court inquired of Papa John's whether the motion for summary judgment turned entirely

on Braafhart's statements because the facts are uncontested.  See Tr. at 4:10-13 (Court).  Papa John's asserted that the result would be the same even with Braafhart's statement.  See Tr. at 4:16-18 (Prynkiewicz)("No.  Even if its in I think the result is the same.").  Papa John's stated that, even assuming that Braafhart's statement is true, and that Hartnett was told what he alleges he was told at Managing Within the Law, there is still no triable issue of fact.  See Tr. at 4:24-5:5 (Prynkiewicz).  Papa John's contended that there is no triable issue, because Hartnett must overcome the presumption of at-will employment, and Hartnett must show that the express contract should be ignored or somehow modified.  See Tr. at 5:5-7 (Prynkiewicz).  Papa John's argued that the cases which support finding an implied contract all did so where there was no express contract for at-will employment.  See Tr. at 5:9-18 (Prynkiewicz).  Papa John's asserted that the one case to which Hartnett cited, where a plaintiff had an express contract for at-will employment, see McGinnis v. Honeywell, Inc., 110 N.M. 1, 791 P.2d 452, not only held that the express contract controlled, but is distinguishable, because the express contract stated that at-will employment was qualified as "subject to the policy and procedures that will be distributed to employees."  Tr. at 5:18-6:6 (Prynkiewicz).

The Court inquired whether there were other New Mexico cases which have held that the words and conduct of a corporation may amend an express contract, and Papa John's admitted that New Mexico cases do so provide.  See Tr. at 6:16-12 (Court, Prynkiewicz).  Papa John's argued that, nonetheless, it is unaware of any case that would allow an implied contract to modify an express contract based on the facts that Hartnett has put forward.  See Tr. at 6:23-7:3 (Prynkiewicz).  Papa John's asserted that this case is unique from most cases, where an implied contract modifies the presumption of at-will employment, because an express contract existed for Hartnett's employment by Papa John's.  See Tr. at 8:11-18 (Prynkiewicz).  Papa John's contended that there is not a case

-29-

where the representation which Hartnett has put forward modify an express contract.  See Tr. at 8:19-21 (Prynkiewicz).

Papa John's then argued that the statement upon which Hartnett relies, made to him by Braafhart, is very similar to that in Hartbarger v. Frank Paxton, Co., which the Supreme Court of New Mexico ruled was not promissory in nature in light of the context and circumstances.  See Tr. at 9:2-13 (Prynkiewicz).  Papa John's contended that Braafhart's statement was not a statement of company policy and that no one could assume from the statement that there was any bargained-for exchange in the employment terms.  See Tr. at 9:17-21 (Prynkiewicz).  Papa John's also contended that Hartnett's reliance on his managerial training from Managing Within the Law is similar to the training given in Hartbarger v. Frank Paxton, Co. and Zarr v. Washington Tru Solutions, LLC., wherein employees argued that, because human resources taught them to follow certain procedures in disciplining employees, their managerial training created an implied contract for employment.  See Tr. at 9:24-10:10 (Prynkiewicz).  Papa John's argued that the New Mexico courts in both cases found an employer's practice of following certain procedures and not discharging employees except for good reason insufficient to create an implied contract for employment.  See Tr. at 10:10-14 (Prynkiewicz).

The Court stated that Hartnett's case seemed to have more than the plaintiffs had in either Hartbarger v. Frank Paxton, Co. or Zarr v. Washington Tru Solutions, LLC, because Hartnett had both statements from Braafhart and the managerial training from Managing Within the Law.  See Tr. at 10:19-24 (Court).  The Court stated that, while managerial training may not be enough, Braafhart's oral statements caused the Court concern.  See Tr. at 11:1-3 (Court).  The Court also stated that having five separate managerial training workshops, in which good cause seemed to be the exclusive reason for terminating an employee, was evidence of a stronger magnitude than Papa

John's had characterized Managing Within the Law.  See Tr. at 11:19-24 (Court).  The Court noted that Hartnett was not referring to his experience in disciplining employees alone, but had managerial training that seemed to state the exclusive reason to terminate an employee was for cause.  See Tr. at 11:15-19 (Court).  Papa John's argued that New Mexico cases have held handbooks that "[express] the way the company does business and the way [it] applies [its] policies," are not contractual promises.  See Tr. at 12:7-15 (Prynkiewicz).

Regarding Hartnett's argument that the implied contract for employment was breached, Papa John's contended that the correct standard to apply is whether "Papa John's reasonably believe[d] that there was a falsification [of] the expense report," not "whether a reasonable person [would] have gotten a statement or whether a reasonable person would have done any number of things," as Papa John's asserted Hartnett contends.  Tr. at 13:9-16 (Prynkiewicz).  Papa John's argued that Hartnett must bring evidence to show that the decision-makers could not have reasonably believed that Hartnett falsified an expense report, because Hartnett agrees that falsifying an expense report is grounds for termination.  See Tr. at 13:16-21 (Prynkiewicz).  The Court inquired why the standard was not whether Papa John's was correct, rather than "good-faith belief," as Papa John's argues.  Tr. at 14:3-5 (Court).  Papa John's contended that New Mexico's jury instruction, see N.M.R.A., Civ UJI 13-2306, supports the use of "reasonable belief" as the standard to determine whether terminating Hartnett was proper, arguing that the case is similar to the way discrimination cases are handled.  Tr. at 14:10-20, 24-25 (Prynkewicz).  The Court stated that it was not aware of such a standard being used in an implied contract case.  See Tr. at 15:16-19 (Court).

Hartnett then responded, and began by stating that the jury instruction was actually a two-prong test, requiring a discharge to be both reasonable and that an employer had sufficient cause.  See Tr. at 16:9-11 (Fogel).  The Court agreed that the jury instruction required an employer to have

both cause to terminate an employee and a reasonable belief in the cause.  See Tr. at 16:14-16 (Court).

Turning to his allegation that an implied contract existed, Hartnett argued that Braafhart's statements track those of the supervisor in Kestenbaum v. Pennzoil, which the Supreme Court of New Mexico found were sufficient to create an implied contract.  See Tr. at 16:21-17:5 (Fogel). Fogel argued that Papa John's stated through the Managing Within the Law workshops that Papa John's only fires or terminates for poor performance, under performance, and for violation of policies, without qualifying that employment with Papa John's is at will.  See Tr. at 17:24-18:1 (Fogel).  The Court inquired whether Hartnett's case turned on the admittance and use of Braafhart's statements, and Hartnett stated that he did not know.  See Tr. at 18:3-10 (Court, Fogel).  The Court inquired whether Hartnett could sustain his case based only on the Managing Within the Law workshops, which the Court stated are similar to an employee merely observing progressive discipline and attempting to claim an implied contract off of the employee's observations -- evidence that New Mexico cases have held is insufficient to create an implied contract.  See Tr. at 18:16-19:5 (Court).  Hartnett argued that human resources officers testified that practices enunciated at Managing Within the Law are company policies, specifically regarding confidentiality in the termination process.  See Tr. at 19:6-23 (Fogel).  Hartnett argued that Managing Within the Law is a mandatory course and that statements made at Managing Within the Law are statements of company policy, unlike the statements made in Hartbarger v. Frank Paxton, Co.  See Tr. at 20:1-13 (Fogel).  Hartnett pointed to the Smith Deposition in support of Managing Within the Law being a forum where company policy is taught.  See Tr. at 20:9 (Fogel).

Hartnett then argued that the express Management Agreement was modified in 2003.  See Tr. at 20-15-18 (Fogel).  Hartnett asserted that, but for Braafhart's statements in 2003, he would not

have signed the CNC Agreement.  See Tr. at 20:23-25 (Fogel).  The Court inquired whether Hartnett

agreed that there was an express contract in place in 1998, and Hartnett agreed.  See Tr. at 21:19-24

(Court, Fogel).

Papa John's responded first by stating that both sides agree that an express contract for

employment was in place in 1998 -- the Management Agreement.   See Tr. at 21:10-12

(Prynkiewicz).  Hartnett argued that the existence of an express contract is crucial, and that no party

has cited a case where an oral agreement modified an express contract.  See Tr. at 22:2-5

(Prynkewicz).  Hartnett admitted that it would be possible to modify an express contract orally, but

that there was not a reported case where it has been done.  See Tr. at 22:10-13 (Prynkiewicz).  Papa

John's argued that neither Managing Within the Law or Braafhart's statements were sufficient to

support an implied contract, much less a modification of an express contract.  See Tr. at 22:17-23:5

(Prynkiewicz).  Papa John's contended that, Braafhart's statements were not in relation to the CNC

Agreement, which Braafhart did not even mention, and were only an expression of opinion.  See Tr.

at 22:17-24 (Prynkiewicz).  Papa John's pointed to the CNC Agreement not even referencing the

Management Agreement as evidence that the CNC Agreement was not a modification of the

Management Agreement.  See Tr. at 22:20-22 (Pyrnkewicz).  Regarding Managing Within the Law,

Papa John's contended that because Hartnett's express agreement was never discussed in the

workshops, nor was employment at will ever discussed at the workshops, "there is just no way that

a jury could conclude from either piece of evidence, [Braafhart] or [M]anaging [W]ithin the [L]aw,

that this express management agreement . . . was modified."  Tr. at 23:10-13 (Prynkiewicz).  Papa

John's further alleged that, according to Hartnett's facts, Managing Within the Law did not teach

that performance and policy were the exclusive reasons an employee would be terminated, only the

primary reasons.  See Tr. at 23:16-25 (Prynkiewicz).  Papa John's asserted that Hartnett has not

shown how Managing Within the Law is different from the facts in cases were an observed company policy was a plaintiff's basis for alleging the existence of an implied contract for employment, and Papa John's argued that Hartnett has not shown how Managing Within the Law is different from the cases where a policy written in a handbook or taught in a managerial course was insufficient to support the existence of an implied contract.  See Tr. at 24:2-14 (Prynkiewicz).[15]

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

---

[15]Papa John's re-stated that it is accepting as true all of Hartnett's facts for its MSJ.  See Tr. at 43:17-21 (Prynkiewicz)("[B]ecause I was accepting all of it . . . as true for his motion for summary judgment.").  Because the local rules establish that "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically converted," D.N.M.LR-Civ. 56.1(b), the Court will deem all facts in the parties' motions as undisputed.

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

          To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid

summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## RELEVANT NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting parties."  Bogle Farms, Inc. v. Baca, 122 N.M. 422, 428, 925 P.2d 1184, 1190 (1996).  "The primary objective in construing a contract is not to label it with specific definitions or to look at form above

substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 122 N.M. at 428, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 95 N.M. 182, 185, 619 P.2d 1226, 1229 (1980)). "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 129 N.M. 677, 683, 12 P.3d 431, 437 (2000) (citation omitted). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991)(internal citation omitted). "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible to vary or modify its terms." C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 508, 817 P.2d at 242 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)(citing Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987)). "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted). If, however, the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." 114 N.M. at 781, 845 P.2d at 1235. But if the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." 114 N.M. at 781, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980)). Once the Court finds that an ambiguity exists, the resolution of that ambiguity becomes a question of fact. See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235. To decide the meaning of any ambiguous terms, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the

circumstances surrounding the agreement, as well as oral evidence of the parties' intent." 114 N.M. at 782, 845 P.2d at 1236.

## RELEVANT NEW MEXICO LAW REGARDING EMPLOYMENT CONTRACTS[16]

"The general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party." Hartbarger v. Frank Paxton, Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(internal citation omitted).   Either party can terminate an at-will employment relationship "at any time for any reason or no reason, without liability." Hartbarger v. Frank Paxton, Co., 115 N.M. at 668, 857 P.2d at 779 (internal citation omitted).  An exception to this general rule exists where a "contract [for employment] is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." Hartbarger v. Frank Paxton, Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(internal citation omitted).   Additionally, evidence of wrongful or retaliatory discharge, or an implied contract, can overcome the presumption that employment for an undefined term is at will.  See Garcia v. Middle Rio Grande Conservancy Dist., 121 N.M. 728, 731-32 918 P.2d 7, 10-11 (N.M.

---

[16]The United States Court of Appeals for the Tenth Circuit has explained:

In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law . . . . The federal court must follow the most recent decisions of the state's highest court . . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do . . . . In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, . . . appellate decisions in other states with similar legal principles, . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law . . . . Ultimately, however, the Court's task is to predict what the state supreme court would do.

Wade v. EMCASCO Ins. Co., 483 F.3d 657, 665-66 (10th Cir.2007)(citations and internal quotation marks omitted).

1996).  If sufficient proof of an implied contract is present, New Mexico courts will imply the consideration necessary to support the implied contract as a matter of law; thus, a party need not prove that consideration was given in exchange for an implied promise to terminate only for good cause, whether the promise was part of the original employment agreement, or a modification thereto.  See Watson v. Blankship, 20 F.3d 383, 392 (10th Cir. 1994)("New Mexico does not require a finding of consideration in order to establish an implied contract of employment.").  See also Hartbarger v. Frank Paxton, Co., 115 N.M. at 670, 857 P.2d at 781 (An implied employment contract does not "require a factual showing of mutual assent to the implied term. . . . [And] [w]e hold today that where there is proof of a promise sufficient to support an implied contract, the consideration sufficient to support the implied contract will be implied as a matter of law by the court . . . .").

"An employer creates an implied contract where the employer's action 'was intended, or reasonably could be interpreted by [the employee] to be confirmation of an implied contract or modification of the employment relationship.'"  Sullivan v. Am. Online, Inc., 219 F.App'x 720, 721 (10th Cir. 2007)(unpublished)(quoting Hartbarger v. Frank Paxton, Co., 857 P.2d at 785).  When a court is called upon to determine if an implied contract for employment has been created, the court should "consider the totality of the parties' relationship, circumstances, and objectives," to assess whether an employee's belief that an implied contract existed was objectively reasonable under the circumstances.  Hartbarger v. Frank Paxton, Co., 115 N.M. at 674-675, 857 P.2d at 785-786.  In deciding whether to grant summary judgment, the objective reasonableness of an employee's expectation or belief is key: "The question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons."  Gerald v. Locksley, 785

F.Supp. 2d 1074, 1108-1109 (D.N.M. 2011)(Browning, J.)(citing Mealand v. E. N.M. Med. Ctr., 131 N.M. 65, 69, 33 P.3d 285, 289 (2001)).  "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable."  West v. Wash. Tru Solutions, LLC, 147 N.M. 424, 426, 224 P.3d 651, 653 (Ct. App. 2009).

A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.  See Abreu v. New Mexico Children, Youth and Families Dept., 797 F.Supp. 2d 1199, 1220-21 (D.N.M. 2011)(Browning, J.) See also Newberry v. Allied Stores, Inc., 108 N.M. 424, 426, 773 P.2d 1231, 1233 (1989)("[A]n exception to at-will employment [is] an implied contract based on the words and conduct of the parties, including provisions in a personnel manual or a handbook.")(internal citation omitted).  Thus, even if one document given to an employee disclaims the existence of a contract for anything besides at-will employment, the disclaimer cannot alone preclude the existence of an implied contract.  See Gerald v. Locksley, 785 F.Supp. 2d at 1108-09.  "[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."  Gerald v. Locksley, 785 F.Supp. 2d at 1108 -1109 (citing Beggs v. City of Portales, 146 N.M. 372, 377, 210 P.3d 798, 803 (2009)).

The Tenth Circuit has found that, when presented with an express employment contract that provided for at-will employment, oral representations from managerial employees are not always

sufficient to create an implied contract that modified the express agreement.  In <u>Cory v. Allstate Ins.</u>, 583 F.3d 1240 (10th Cir. 2009), an independent contractor appealed to the Tenth Circuit a district court's dismissal  of the contractor's breach of an implied contract claim for failure to state a claim upon which relief can be granted.  <u>See</u> 583 F.3d at 1241.  The contractor had signed an employment agreement that expressly provided that the contractor may be terminated at any time and without notice, and that the agreement could not be modified by oral statements, representations, or agreements.  <u>See</u> 583 F.3d at 1241.  The contractor asserted that statements which his immediate supervisor and another managerial-level employee made to him had created an implied contract that modified his employment agreement.  At the time the statements were made, the contractor was under investigation for allegedly forging documents, an offense which he knew could lead to termination.  The supervisor and manager both told the contractor that, "if he didn't do it, he'd be fine, nothing would happen."  583 F.3d at 1242.  As the employer's investigation of the contractor revealed, the contractor had not forged any documents, but had directly supervised and failed to stop an employee who forged documents, and the employer terminated the contractor on that basis.  <u>See</u> 583 F.3d at 1242.  The Tenth Circuit found that the statements alone failed to establish a plausible claim upon which relief could be granted.  <u>See</u> 583 F.3d at 1245.  While the Tenth Circuit noted that oral representations alone "may be sufficient to create an implied contract," the court held that the statements by the supervisor and manager failed to be definite, specific, or explicit enough to create a reasonable expectation of an implied contract existing.  583 F.3d at 1245 (quoting <u>Kestenbaum v. Pennzoil, Co.</u>, 108 N.M. at 24, 766 P.2d at 284).  In light of the contractor's express agreement that disclaimed any possibility or oral modification, and that the contract expressly provided for employment at will, the Tenth Circuit held that the contractor could not have believed that "non-specific statements of two employees that 'nothing bad would happen'" could have created a

reasonable belief that the express agreement was modified.  583 P.3d at 1245.  See also Hartbarger

v. Frank Paxton, Co., 115 N.M. at 670, 857 P.2d at 783 ("The reasonableness of expectations is

measured by just how definite, specific, or explicit has been the representation or conduct relied

upon.").

       Where parties have entered into an express employment contract, the Supreme Court of New

Mexico has held that attempting to establish an implied contract is unnecessary to the extent an

employer's action was in violation of the terms of the express contract.  In McGinnis v. Honeywell,

Inc., the Supreme Court of New Mexico determined that an employer had breached the terms of its

express contract for employment with an employee by failing to follow the employer's published

termination practices.  See 110 N.M. at 4, 791 P.2d at 455.  The Supreme Court found it was

unnecessary to look for the existence of an implied contract to follow certain policies and procedures

in termination given that the employee had signed an express contract with the employer.  See 110

N.M. at 4, 791 P.2d at 455.  The express contract that the employee signed stated: "My employment

is in accordance with any applicable written agreement and applicable personnel practices published

to employees, and *subject to such* agreements or *practices* may be terminated by me or by

Honeywell at any time. . . ." 110 N.M. at 3, 791 P.2d at 454 (emphasis added by the Supreme Court

of New Mexico).  The Supreme Court of New Mexico was "struck by the fact that the parties at trial

by and large confined themselves to a dispute about whether or not an implied contract for

employment existed, without addressing the point, which strikes us as fairly obvious, that there was

an express contract."  110 N.M. at 4, 791 P.2d at 455.  The Supreme Court of New Mexico looked

to the employee's contract, and held that, if the defendant, Honeywell, had published certain

practices to the employee that provided for her termination only under certain conditions and certain

ways, and if Honeywell terminated the employee without adhering to those practices, Honeywell

had breached "an express contract of employment."  110 N.M. at 4, 791 P.2d at 455.  Thus, where

employment at will is expressly conditioned upon adherence to certain practices, a court need not

look for an implied contract when a discharged employee asserts that an employer breached its

published practices in a termination.  See 110 N.M. at 6, 791 P.2d at 457 ("[W]hile McGinnis agreed

that her employment could be terminated 'at any time,' Honeywell expressly conditioned its right

to terminate her employment on certain policies and procedures communicated to its employees .

. . . McGinnis was entitled to the procedures spelled out in the realignment guide" that had been

distributed to employees.).

In Hartbarger v. Frank Paxton, Co., the Supreme Court of New Mexico did not agree with

an employee, Hartbarger, that an implied contract had been created by an employee handbook, the

employer's custom of retaining employees for a long time and firing only for a good reason, and oral

statements by the employee's supervisor.  See 115 N.M. at 675, 857 P.2d at 786.  The Supreme

Court explained that the handbook contained a section titled "Fair and Square Policies," and

"Logical and Practical Rules," but there was no statement "to the effect that the handbook reflects

established procedure regarding suspension of problem employees and termination for those who

cannot conform to Company Policy."  115 N.M. at 673, 857 P.2d at 784.  The handbook did not state

that the enumerated reasons for terminating employees were exclusive, and the handbook did not

"directly or indirectly [refer] to a policy that Paxton will fire employees only for just cause."  115

N.M. at 673, 857 P.2d at 784.  The Supreme Court of New Mexico found that the employer's policy

of keeping employees for a long term and normally firing employees for a good reason in itself, was

"no indication that Hartbarger had an implied contract requiring that termination be only for just

cause."  115 N.M. at 674, 857 P.2d at 785.  The Supreme Court of New Mexico stated:

As a matter of policy, this Court will not consider evidence that a company does not

> usually fire employees without a good reason as by itself establishing that the
> company does not maintain an at will employment policy.  To do so otherwise would
> encourage employers to occasionally fire employees for no other reason than to show
> that they maintain the freedom to do so.

115 N.M. at 674, 857 P.2d at 785.  Hartbarger's reliance on statements that his supervisor made, in

the context of Hartbarger's concerns regarding the potential sale of Paxton, were insufficient to

create a reasonable expectation of a contract for guaranteed employment.  Hartbarger had inquired

what would happen if Paxton were sold, and the Supreme Court found that the supervisor's

response, that Hartbarger would have a job as long as he took care of what he was doing and kept

up sales, was an "opinion as to job security if the company were to be sold."  115 N.M. at 674, 857

P.2d at 785.  Unlike cases in which oral statements had given rise to implied contracts, the

supervisor was "not making a statement of current or future company policy regarding its

employment relationship with Hartbarger," and, thus, no reasonable interpretation of the

supervisor's comments would lead an employee to believe that the supervisor was promising or

reaffirming a promise for more than at-will employment.  115 N.M. at 674, 857 P.2d at 785.

Furthermore, Hartbarger admitted that he and his supervisor were on a friendly basis at the time the

statements were made, that the conversation was "off the record," and that he knew his supervisor

did not have the authority to bind a new owner if a sale occurred.  115 N.M. at 674, 857 P.2d at 785.

The informality of the context in which the supervisor spoke weighed against his statements giving

rise to an implied contract.  See 115 N.M. at 674-75, 857 P.2d at 785-86.

Applying New Mexico law, the Tenth Circuit has held that an employee, who received four

separate documents that expressly provided for her employment to be at will, could not reasonably

expect a personnel manual, management training, or oral representation to have created an implied

contract superseding her at-will employment.  See Sullivan v. Am. Online, Inc., 219 F.App'x at 722

-44-

(unpublished).[17]   The plaintiff in <u>Sullivan v. Am. Online, Inc.</u>, alleged that America Online had breached an implied contract of employment to terminate her only for cause or after certain procedures were followed.  <u>See</u> 219 F.App'x at 721-23.  The plaintiff, Seree Sullivan, received four different documents from American Online, all of which expressly affirmed her at-will employment status.  <u>See</u> 219 F.App'x at 722.  Sullivan signed an "'Application Form,' that stated she would be hired on an 'at will basis' and the conditions of her employment were modifiable 'only by means of signed written document.'" 219 F.App'x at 722 (internal citations omitted).   Sullivan also acknowledged, by signing her offer letter, that her "employment at America Online is at will and she or the company is free to terminate the employment at any time with or without cause."  219 F.App'x at 722 (internal citations omitted).   Third, Sullivan signed a form entitled "Business and Personal Conduct" which apprised her of America Online's policy of immediately disciplining employees, whether by termination or other procedures, for any action, among others, that constituted "disrespect or discourteous conduct to . . . other personnel."  219 F.App'x at 722.

The fourth document to which the Tenth Circuit referred was the America Online Employee Handbook, the same document upon which Sullivan based part of her allegation that an implied contract to terminate only for cause existed.  <u>See</u> 219 F.App'x at 722-23.  The Tenth Circuit pointed to language in the America Online Employee Handbook which stated that America Online and "the employee . . . have the right to terminate employment at will, with or without cause, at any time," and held that the handbook did not, under New Mexico law, "create an expectation of an implied

---

[17]Because <u>Sullivan v. Am. Online, Inc.</u>, is an unpublished opinion, the Court does not rely on it for binding precedent, but only to the extent its reasoned analysis is persuasive in the present case.  <u>See</u> 10th Cir. R. App. P. 32.1(A); <u>U.S. v. Lyons</u>, 510 F.3d 1225, 1233 n. 2 (10th Cir. 2007)("Unpublished opinions are not binding precedent. . . [w]e mention [an unpublished opinion] as we would an opinion from another circuit, persuasive because of its reasoned analysis.").

contract." 219 F.App'x at 722-23.  Sullivan had alleged that America Online breached an implied contract by failing to follow the policies and procedures outlined in the handbook regarding investigation of incidents, and employee termination.  See 219 F.App'x at 723.  Notwithstanding the handbook containing a description of policies and procedures to be followed prior to terminating an employee, the Tenth Circuit found that Sullivan could not reasonably have expected an implied contract to exist, as the handbook also expressly disclaimed any possibility that it modified the at-will nature of employment with America Online.  See 219 F.App'x at 722.  "[E]ven assuming AOL failed to follow its written harassment policy, AOL's employee handbook read as a whole undermines any claim that Ms. Sullivan reasonably understood her at-will status was impliedly altered by the . . . policy." 219 F.App'x at 723.  Further, Sullivan acknowledged that the polices in the handbook were not always used, and that she was aware of situations in which employees could be terminated immediately, as a supervisor confirmed in her deposition, which undercut her belief that the handbook created an implied contract.  See 219. F.App'x at 723 n. 1.

Nor were the statements from Sullivan's supervisor that employees are "not ever slammed without cause," and that the "only two ways you can get fired from AOL are to have an attendance issue or just be plain stupid," sufficient to create an implied contract for employment.  219 F.App'x at 723 n. 1.  The Tenth Circuit explained that the context in which these statements were made to Sullivan -- when she began working at America Online and later to instruct Sullivan regarding how she should discipline the employees under her -- weighed against the statements altering Sullivan's at-will status.  219 F.App'x at 723 n. 1.  "In light of . . . repeated unequivocal written declarations of Ms. Sullivan's at-will status, one of which expressly precluded modifications, we conclude Ms. Sullivan could not have reasonably expected" that an implied contract to terminate her employment only for cause existed.  219 F.App'x at 722.

The Court has previously found that an employee manual with non-specific statements regarding procedures did not mandate employees or the employer to follow the procedures, was insufficient to create an implied contract that the procedures in the manual would be followed in every instance.  See Clayton v. Vanguard Car Rental, U.S.A., Inc., 761 F.Supp. 2d 1210, 1281-82 (D.N.M. 2010)(Browning, J.).  In Clayton v. Vanguard Car Rental, U.S.A., Inc., the employer's Associates' Handbook stated that the employer "encourages and expects reports of all instances of harassment or discrimination," and that retaliation against somebody who reported harassment was "strictly prohibited and will result in discipline."  761 F.Supp. 2d at 1277.  Looking to New Mexico law, the Court found that these statements were "mere declarations of [the employer --] Vanguard's [--] approach to investigations, and are not sufficiently specific to create an implied contract."  761 F.Supp. 2d at 1281.  Notably, the anti-discrimination policy did not promise that Vanguard would investigate all complaints, nor did the policy contain mandatory language.  The Court determined that Vanguard was merely professing a goal of complying with federal and state laws regarding discrimination, and was not promising to follow any particular practice in every instance.  See 761 F.Supp. 2d at 1281-82.  The Court, thus, found that Vanguard's anti-discrimination policy was a "general statement or guideline," and not sufficiently specific and definite to create a reasonable expectation that an implied contract to follow certain procedures in investigating discrimination claims existed.  761 F.Supp. 2d at 1282.

Similarly, the Court of Appeals of New Mexico found that summary judgement was proper because no implied contract could have reasonably and objectively been expected to exist in Zarr v. Washington Tru Solutions, Inc.  See 146 N.M. at 279, 208 P.3d at 924.  The employee in Zarr v. Washington Tru Solutions, Inc., alleged that the employer's practices had altered her employment relationship "so that she could only be fired with good cause after progressive discipline."  115 N.M.

at 278, 857 P.2d at 923.  When the employee applied, she was told that her employment would be at will, and terminable by either her or her employer at any time.  She had received an employee handbook that described policies and procedures, but also acknowledged that employment was terminable at will at any time and that the handbook's provision were not to be construed as an employment contract.  <u>See</u> 115 N.M. at 278, 857 P.2d at 923.  The employee did not allege that anybody had told her at any time that her position was not terminable at will, and she could not cite to any specific provision in the employer's policies and procedures that restricted the employer's right to terminate employment at any time.  <u>See</u> 115 N.M. at 279, 857 P.2d at 924.  The employee's belief was based upon her own experience as a supervisor when she disciplined subordinates.  The employee asserted that she had consulted with human resources personnel, who instructed her in the disciplinary procedures to be followed, short of terminating two subordinates for separate infractions.  <u>See</u> 115 N.M. at 279, 857 P.2d at 924.  The employee argued that her interactions with human resources, and the management training she received that taught her to administer progressive discipline, "established an implied contract that negated [the employer's] express statement that her employment was terminable at any time by either party."  115 N.M. at 279, 857 P.2d at 924.  The Court of Appeals of New Mexico disagreed.  Looking to Supreme Court of New Mexico precedent, the Court of Appeals found that, "even viewing all evidence in the light most favorable [to the plaintiff]," the employee's reliance on two instances in which she used progressive discipline with subordinates did not create an objectively reasonable expectation that an implied contract to terminate for cause existed.  115 N.M. at 279, 857 P.2d at 924.  The Court of Appeals of New Mexico thus found that the employee had not shown a genuine issue of material fact sufficient to overcome a motion for summary judgment on her claim for breach of an implied contract of employment.  <u>See</u> 15 N.M. at 279, 857 P.2d at 924.

On the other hand, the Supreme Court of New Mexico has held that an employer's statements made during the oral negotiation of the terms of employment can be sufficient to create an implied contract to terminate only for cause.  See Kestenbaum v. Pennzoil, Co., 108 N.M. at 24, 766 P.2d at 284 ("[C]ourts recognize that an oral statement made by an employer may be sufficient to create an implied contract which provides that an employee shall not be discharged except for cause.").  In Kestenbaum v. Pennzoil, Co., the parties did not dispute that an employee's supervisor "made clear that the employment would be long term and permanent as long as [the employee] did his job."  108 N.M. at 25, 766 P.2d at 285.  The employee, Kestenbaum, testified that he would not have accepted the position had his employment not been guaranteed.  See 108 N.M. at 25, 766 P.2d at 285.  Pennzoil's officers, including its operations manager, investigator, vice-president, and Kestenbaum's immediate supervisor, all confirmed that they believed the company policy was to only terminate employees for good reason or for just cause.  See 108 N.M. at 25, 766 P.2d at 285.  Additionally, the insurance benefits manual and policy manual given to Kestenbaum did not contain any mention of employment with Pennzoil being at will only.  See 108 N.M. at 25, 766 P.2d at 285.  Although Kestenbaum did not have an express or written agreement for employment, this fact did not keep the Supreme Court of New Mexico from concluding that, under the totality of the parties' relationship, an implied contract to terminate for cause only existed.  See 108 N.M. at 26, 766 P.2d at 286.  The Supreme Court of New Mexico noted that, under the Supreme Court of New Mexico's precedent,  the statements in the manuals alone could not give rise to an implied contract.  See 108 N.M. at 26, 766 P.2d at 286 ("Undoubtedly, under Sanchez v. The New Mexican, [106 N.M. 76, 738 P.2d 1321 (1987),] the policy statements addressing insurance benefits and severance pay would, without more, be inadequate to alter the at will relationship.").  Looking to the totality of the circumstances, including Kestenbaum's uncontroverted testimony, and the statements from

Pennzoil's officers regarding the company's practice of termination for cause only, along with the manuals, the Supreme Court of New Mexico found that "there is substantial evidence to support the jury finding that an implied employment provision for discharge only for good reason was in effect." 108 N.M. at 26, 766 P.2d at 286.

The Supreme Court of New Mexico has held that "a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined."   Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234.  "Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it." Lukoski v. Sandia Indian Mgmt., 106 N.M. at 664, 666, 748 P.2d 507, 509 (1988).  In Garcia v. Middle Rio Grande Conservancy Dist., the Supreme Court of New Mexico found that, absent an express agreement to the contrary, an employer's written personnel policy that controlled the parties' employment relationship constituted an implied contract for employment. See 121 N.M. at 733, 918  P.2d at 13.  No other evidence of an implied contract was put forward.  See 121 N.M. at 730, 918 P.2d at 9 (explaining that the only fact upon which the employee relied in asserting the existence of an implied contract was the personnel policy).  Because the employer's personnel policy "contain[ed] provisions relating to most every aspect of an employment relationship," and included a section on administrative remedies that applied "when personnel actions result in suspension, termination, or demotion," the Supreme Court of New Mexico concluded that the personnel policy was specific enough so that employees "may reasonably rely on its provisions and may expect that [the employer] will conform as well."  121 N.M. at 732, 918 P.2d at 11.

In Newberry v. Allied Stores, the Supreme Court of New Mexico found that a policy manual

given to an employee during his training constituted an implied contract for employment. See 108 N.M. at 428, 773 P.2d at 1235. The employee did not have an express agreement of employment. See 108 N.M. at 426, 773 P.2d at 1233. The employee was told, during his management training, that the manual was "his bible" and that he had to follow the manual. 108 N.M. at 428, 773 P.2d at 1235. The manual applied to both salaried and hourly employees, and evidence had been submitted that employees believed they could be terminated only for good reasons. See 108 N.M. at 428, 773 P.2d at 1235. The Supreme Court of New Mexico looked to the manual's language regarding involuntary termination, which stated: "To be discharged as the result of rule infractions, poor performance, or other 'cause' is a situation you and only you, control." 108 N.M. at 428, 773 P.2d at 1235. Notwithstanding that the manual also stated that termination could be immediate in some situations, the Supreme Court of New Mexico found the language regarding the employee's control over involuntary termination in the manual, in addition to the manual's mandatory nature, and that the manual was given to the employee during his training, was sufficiently specific and objectively reasonable to give rise to an implied contract of employment. 108 N.M. at 428, 773 P.2d at 1235.

Lastly, in Lukoski v. Sandia Indian Mgmt. Co., the Supreme Court of New Mexico found that an employee handbook amended an oral agreement for one-year employment. See 106 N.M. at 666, 748 P.2d at 509. No written agreement had been made between the employer and employee in Lukoski v. Sandia Indian Mgmt. Co., but the oral agreement was binding. See 106 N.M. at 665, 748 P.2d at 508. Several months after the employee began working as a general manager, he and all other employees were given an employee handbook, of which they were required to verify their receipt, acknowledge their acceptance, and agree to conform with the handbook's policies and procedures. See 106 N.M. at 665, 748 P.2d at 508. The handbook characterized the disciplinary

policy contained therein as "an established procedure regarding suspension of problem employees and termination for those who cannot conform to Company Policy."  106 N.M. at 666, 748 P.2d at 509.  Additionally, the handbook did not contain a disclaimer or any other warning against the employee's reliance on the policies outlined therein.  See 106 N.M. at 666, 748 P.2d at 509.  The Supreme Court concluded that "substantial evidence supports the findings . . . that the employee handbook modified the employment relationship and created warning and suspension procedures which were not followed in this case."  106 N.M. at 667, 748 P.2d at 510.

### NEW MEXICO LAW REGARDING AN EMPLOYER'S COMPLIANCE WITH AN IMPLIED AGREEMENT TO TERMINATE FOR CAUSE ONLY

N.M.R.A. Civ. UJI 13-2306 provides the standard for courts to use when determining if an employer has complied with its implied contract to discharge an employee only for cause:

> If _____(employer) agreed that _____ (employee) could be discharged only for cause, _____ (employer) could discharge _____ (employee) without violating the agreement if _____ (employer) in fact believed that [he] [she] had a sufficient cause to justify the discharge of _____ (employee) and that belief was reasonable.

N.M.R.A. Civ. UJI 13-2306.  This instruction is to be given if the instruction for finding that an implied contract to terminate an employee for cause only is also given.  See N.M.R.A. Civ 13-2306; N.M.R.A. Civ. UJI 3-2302 (2008).  "The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law."  Todd v. Montoya, No. CIV 10-0106 JB/KBM, 2012 WL 2574809, at *42 n. 61 (D.N.M. 2012)(Browning, J.)(citing State v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994)("[T]his Court's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.")).

A New Mexico Court of Appeal has held that this standard is both a subject and objective one.  See Gingrich v. Sandia Corp., 142 N.M. 359, 364, 165 P.3d 1135, 1140 (Ct. App. 2007)("The standard articulate in UJI 13-2306 is both objective and subjective"), cert denied, 142 N.M. 330, 165 P.3d 327 (2007)(table).  The court in Gingrich v. Sandia Corp., explained that this conjunctive test required the court to weigh whether there was an "actual (i.e. subjective) belief on the part of the employer that its actions were justified, and also test[] the objective reasonableness of that belief." 142 N.M. at 365, 165 P.3d at 1141.  Although this case is used in the committee's comments to N.M.R.A. Civ. UJI 13-2306, and the Supreme Court of New Mexico denied certiorari to review the Court of Appeals of New Mexico's decision, an employer's subjective belief does not appear to be relevant if that belief is also tested for its objective reasonableness.  See N.M.R.A. Civ. UJI 13-2306 cmt. n. 1 (1999).  The jury instructions for finding an implied contract to terminate an employee only for cause clarify the committee's comments for N.M.R.A. Civ. UJI 13-2306.  The committee comments for N.M.R.A. Civ. UJI 13-2302 state:

> Where an implied agreement required good cause for termination is found, discharge of the employee cannot be justified on the basis of the employer's good faith, but rather must be supported by "reasonable grounds [for the employer] to believe that sufficient cause existed to justify [the employee's] termination." . . . This is an "objective standard of reasonable belief."

N.M.R.A. Civ. UJI 13-2302 cmt. (quoting Kestenbaum v. Pennzoil, Co., 108 N.M. at 27, 766 P.2d at 287.).  Where an implied contract exists that an employer will only terminate an employee for cause, the employer, thus, can only be justified in terminating an employee if the employer had reasonable grounds to believe that sufficient cause existed to justify the termination.  See Kestenbaum v. Pennzoil, Co., 108 N.M. at 27, 766 P.2d at 287.

For example, in Newberry v. Allied Stores, Inc., the Supreme Court of New Mexico found that an employer was justified in terminating an employee for that employee's violation of an

express policy in the policy manual, when the Supreme Court had already found that the manual controlled the employer-employee relationship.  See 108 N.M. at 427, 773 P.2d at 1235.  The Supreme Court of New Mexico found that there had been no breach by the employer in discharging the employee, because the employee had been warned about similar behavior in the past, the behavior  was characterized as "dishonesty, gross insubordination, and [a] flagrant violation of company policy," such that there were grounds for immediate dismissal, and the policy that the employee violated was understood by and applied to all employees.  108 N.M. at 427, 773 P.2d at 1235.

On the other hand, in Kestenbaum v. Pennzoil, Co., the Supreme Court of New Mexico found that an employer did not have sufficient cause to terminate an employee under an implied contract to terminate for cause only.  See 108 N.M. at 27-28, 766 P.2d at 287-88.  In a deposition, the investigator looking into the employee's alleged conduct of sexual harassment testified that her summary of evidence did not "differentiate between first-hand knowledge, attributed hearsay, or mere gossip or rumor, and no attempt was made to evaluate the credibility of the persons interviewed."  108 N.M. at 27-28, 766 P.2d at 287-88.  This investigation, with nothing more, was used as the basis to terminate the employee.  The Supreme Court of New Mexico found that the investigation was insufficient to discharge the employer's duty in an implied contract to terminate the employee for cause only.  See 108 N.M. at 28, 766 P.2d at 288.

## ANALYSIS

Genuine issues of material fact are present, and the Court may not rule as a matter of law in favor of Papa John's.  The Court accepts all of Hartnett's evidence as true and construes all justifiable inferences in favor of Hartnett.  See Fed. R. Civ. P. 56(a)("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."); Hunt v. Cromartie, 526 U.S. at 552 ("[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." (internal quotations and alterations omitted).  See also MSJ ¶¶ 1-18, at 2-5; Response ¶¶ 1-83, at 1-1; Papa John's Reply at 1-10 (listing "undisputed" or "uncontested" facts and not contesting the facts put forward by the opposing party); Tr. at 4:2-9 (Prynkiewicz)("[W]e didn't contest the facts because we don't think it matters.").  Based on the totality of Hartnett's relationship with Papa John's, a reasonable jury could conclude that Papa John's words and conduct communicated to Hartnett that he would be terminated for cause only and after certain procedures were followed.  See Gerald v. Locksley, 785 F.Supp. 2d at 1108 ("An implied contract is created only where an employer creates a reasonable expectation.  The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon.").  Moreover, evidence exists which would support Hartnett's allegation that Papa John's breached its implied contract with Hartnett by failing to follow certain procedures and terminating Hartnett without cause.  Thus, the Court cannot rule as a matter of law in favor of Papa John's and will deny Papa John's MSJ.

## I.   PAPA JOHN'S AND HARTNETT ENTERED INTO AN EXPRESS AGREEMENT FOR EMPLOYMENT AT WILL.

The parties do not contest that Hartnett entered into an express contract for at-will employment with Papa John's on August 17, 1998.  See Tr. at 21:19-24 (Court, Fogel); id. at 21:10-12 (Prynkiewicz).  Neither party argues that the Management Agreement is ambiguous.  Because the role of the Court is to "ascertain and enforce the intent of the parties as shown by the contents of the instrument," and neither party has argued that the Management Agreement is ambiguous, whether regarding its terms or as a whole, the Court concludes that the terms of the Management

Agreement created a valid and binding contract for Hartnett's employment to be at will with Papa John's.  Bogle Farms, Inc. v. Baca, 122 N.M. at 428, 925 P.2d at 1190.[18]

The Management Agreement provides, at paragraph 6 -- the last paragraph before Hartnett's signature:

> Notice to Employees.  This document does not grant, create or extend any contractual rights the above employee [sic] with respect to (i) such employee's current or future employment, or (ii) any benefits in connection with such employment.  The employee or the employer may sever the employment relationship at any time or for any reason at all.

Management Agreement, ¶ 6, at 1.  Hartnett signed the Management Agreement, affirming that the contract was executed and delivered to him, and that he relied upon the agreement to explain his "consideration [for] such employemnt" with Papa John's.  Management Agreement at 1.  The Court thus concludes that Hartnett's initial employment with Papa John's was for at-will employment.  See McGinnis v. Honeywell, 110 N.M. at 4, 791 P.2d at 455 (finding that the express employment agreement entered into at the beginning of a plaintiff's employment relationship with an employer provided the terms that governed the employee's employment).

---

[18]None of the parties have requested a Mark V hearing or have identified any extrinsic evidence that would call for a Mark V hearing.  According to the Supreme Court of New Mexico in Mark V, Inc. v. Mellekas, 114 N.M. 778, 845 P.2d 1232 (1993), a district court may take extrinsic evidence to determine whether a contract is ambiguous.  See 114 N.M. at 781-82, 845 P.3d at 1235-36.  There are no indications that, at a Mark V hearing, the Court would obtain any extrinsic evidence that would aid in its interpretation of the Arbitration Agreement.  See Abreu v. N.M. Children, Youth and Families Dep't, 797 F.Supp. 2d 1199, 1247 n. 23 (D.N.M.2011)(Browning, J.)("Also, the Plaintiffs did not ask for a Mark V hearing or point to any extrinsic evidence it would submit at a Mark V hearing. There is no indication that, at a Mark V hearing, the Court would have anything different to interpret the implied contract that it has now.").

II.     **A GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING WHETHER AN IMPLIED CONTRACT MODIFIED HARTNETT'S AT-WILL EMPLOYMENT WITH PAPA JOHN'S.**

Hartnett contends that Braafhart's statements, made when Hartnett executed the CNC Agreement, and the management training Hartnett received at five separate Managing Within the Law Workshops, modified his employment-at-will status.  See Response at 12, 13.  Papa John's contends that the Management Agreement and Team Member Handbook expressly provide for Hartnett's employment to be at will.  See MSJ ¶¶ 16-17, at 4-5.  Papa John's also argues that the statements made by Braafhart could not be reasonably interpreted as a promise on behalf of Papa John's that Hartnett's at-will status was altered.  See MSJ at 8.  Papa John's also contends that the matters discussed at Managing Within the Law were not inconsistent with an at-will policy, and that the workshops explanation of Papa John's "general approach to disciplining employees . . . did not contain the type of definite, specific, or explicit statements that could have created a reasonable expectation" in Hartnett, or any other employee, "that Papa John's was contractually bound to terminate its employees only for good cause and only after following certain procedures."  Papa John's Reply at 8.

A.     **THERE ARE FIVE SEPARATE CATEGORIES OF RELEVANT EVIDENCE REGARDING HARTNETT'S EMPLOYMENT STATUS.**

There are five categories of relevant evidence of Hartnett's employment status.  Some do not, alone, suggest finding that the at-will-employment relationship was altered.  In totality, however, they support a conclusion that there is a genuine issue of material fact whether the express contract was altered.

1.     **Braafhart's Statements.**

Papa John's requested Hartnett to sign the CNC Agreement on January 7, 2003, which

required Hartnett to not work in the Pizza industry for eighteen months after leaving Papa John's. See Response ¶ 2, at 1.  The CNC Agreement does not refer to Hartnett's employment status.  The CNC Agreement does state that signing executing the CNC Agreement is "a condition to the employment of Employee."  CNC Agreement ¶ 4, at 3.  Hartnett was concerned about the restrictive nature of the CNC Agreement and wanted more time to consider executing the CNC Agreement when it was first presented to him.  See Response ¶ 4, at 2.  Braafhart, Papa John's Regional Vice President, told Hartnett: "Don't worry about it.  You're a performer.  As long as you perform, don't violate any policies and procedures, you'll be here forever."  Response ¶ 5, at 2.  Hartnett believed that these statements meant that Hartnett could expect to always work for Papa John's, and thus Hartnett did not need to worry about the CNC Agreement.  Hartnett would not have signed the CNC Agreement at the time had Braafhart not made the statements he did.  See Response ¶ 6, at 2; MSJ ¶ 14, at 4.

Were the only evidence before the Court the Management Agreement and the statements that Braafhart made when Hartnett signed the CNC agreement, the Court would likely find that the statements alone were insufficient to modify Hartnett's express contract for at-will employment. As the Tenth Circuit explained in Cory v. Allstate Ins., even statements that managers and supervisors made to a contractor were insufficient to modify an express contract for employment to be at will.  See 583 F.3d at 1242, 1245. Braafhart's statements are similar to those that were made to the contractor in Cory v. Allstate Ins.; in both instances, a direct supervisor made a statement regarding the employee's future employment, in the context of the employees' voicing concerns about their future employment and both statements by the supervisors were nonspecific and indefinite in their promises.  Braafhart did not provide a time frame for Hartnett to expect his employment to continue with Papa John's.  See Hartnett Dep. at 63:4-5.  Braafhart promised that

Hartnett would be with Papa John's "forever,"  MSJ ¶ 13, at 3, and the supervisors promised Cory that he would "be fine, nothing bad would happen," 583 F.3d at 1242.

Braafhart's statements do not seem to be as informal as the, "off the record" statements that the supervisor made in Hartbarger v. Frank Paxton, Co., which did not give rise to an implied contract for employment.  115 N.M. at 674, 857 P.2d at 785.  Braafhart's statements could appear to be part of a bargained-for-exchange in negotiating the terms of employment, as were the statements in Kestenbaum v. Pennzoil, Co.  See 108 N.M. at 25, 766 P.2d at 285.  Indeed, Hartnett asserts that he would not have signed the CNC Agreement had Braafhart not given him assurances of Hartnett's continued employment with Papa John's, and that he thus did not need to worry about finding work at another pizza company after termination.  Unlike Kestenbaum v. Pennzoil, Co., however, Hartnett and Papa John's had an express contract that provided for employment to be at will.  Braafhart's statements are, thus, more similar to those made by the manager and supervisor in Cory v. Allstate Ins., where promises of assurance in the face of fear of termination were insufficient to modify the expressly at-will nature of Hartnett's employment with Papa John's.  See 583 F.3d at 1245 ("The Agreement also gave Allstate the express right to terminate [Cory] . . . at any time and without notice . . . . Cory therefore could not have reasonably expected that . . . Allstate limited its right to terminate the Agreement through the nonspecific statements of two employees that 'nothing would happen.'").  See also Hartbarger v. Frank Paxton, Co., 115 N.M. at 670, 857 P.2d at 783 ("The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon.").  Braafhart's statements, thus, do not appear sufficient to give rise to an implied contract that Hartnett would only be terminated for cause, as Braafhart did not mention Hartnett's employment status at the time, and Hartnett had already executed the Management Agreement that expressly provided for his employment to be at-will.

-59-

### 2.      **The Team Member Handbook.**

The Team Member Handbook does not help Hartnett's belief.  The Team Member Handbook contains three separate disclaimers, which all unambiguously state that the Team Member Handbook does not create any contractual right or modify the at-will nature of employment with Papa John's.  See Team Member Handbook at 3,4 (Doc. 92-2); Team Member Handbook at 5 (Doc. 101-9).  The Team Member Handbook is thus similar to the handbook distributed in Sullivan v. Am. Online, Inc., which stated that "the employee and AOL have the right to terminate employment at will, with or without cause, at any time," and thereby helped to defeat the reasonableness of Sullivan's belief that she had an implied contract to be terminated only for cause.  See 219 F.App'x at 722.  Although the Team Member Handbook provides that Papa John's will evaluate the seriousness of an infraction, an employee's past work history, and the nature of the violation, in determining which corrective action to administer, this statement does not change the overall tone of the Team Member Handbook, in light of three disclaimers that expressly foreclose any believed modification of Papa John's employees' at-will status.  See Team Member Handbook at 4 (Doc. 101-9).  Yet, "[a] contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties' 'norms of conduct and expectations founded upon them.'"  Zaccardi v. Zale Corp., 857 F.2d 1473, 1476 (10th Cir. 1988)(quoting Hillis v. Meister, 82 N.M. 474, 477, 483 P.2d 1314, 1317 (1971)).  Also, Hartnett did not sign or otherwise affirm his receipt and acknowledgment of the Team Member Handbook, as the employees did in Sullivan v. Am. Online, Inc. and Lukoski v. Sandia Indian Mgmt. Co., a factor that those courts weighed in favor of the disclaimer and other terms in the policies affecting the employees' at-will status.  See Sullivan v. Am. Online, Inc., 219 F.App'x at 722 (finding that an employee having signed her receipt of a handbook which affirmed her at-will status and disclaimed that the handbook

-60-

altered that status weighed in favor of her not reasonably believing she had an implied contract for employment); Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. at 664, 748 P.2d at 508 (finding that an employee's signing in affirmation of his receipt of an employment manual weighed in favor of the manual's terms affecting the status of his employment).  On the other hand, Hartnett testified that he received a handbook , and that he understood that falsifying a Papa John's expense report or that violating Papa John's code of ethics and business conduct could result in his termination. See Hartnett Dep. at 59:11-23, 61:4-8.

### 3.  The Managing Within the Law Workshops.

The Managing Within the Law annual workshop was mandatory for Papa John's' managers and officers, and was taught by Papa John's' human resources director.  See Response ¶ 9, at 2.  The human resources director teaching the workshop informed Hartnett that employees were terminated "primarily for violation of company policy and poor performance," and did not state that employment would be terminated for another reason.  Response ¶ 11, at 2.  The materials used to teach Managing Within the Law do not discuss the at-will employment status of employees who attend the workshops.  See Training Guide at 1-32.  The human resources officers teaching Managing Within the Law never stated that attendees were employed at will.  See Response ¶ 12, at 2-3.  Those who taught Managing Within the Law did not state that the Team Member Handbook superseded the policies and procedures taught at Managing Within the Law.  See Response ¶ 13, at 3.  Hartnett understood from Managing Within the Law that he would receive "due process in any investigation to determine whether or not a violation of a company policy had occurred," and that certain procedures would be adhered to prior to his termination.  Response ¶¶ 14-15, at 3.

Hartnett's managerial training received at Managing Within the Law could be sufficient to create a reasonable expectation that Papa John's would abide by the procedures taught at the

workshop, were that the only piece of evidence before the Court.  See Lukoski v. Sandia Indian

Mgmt. Co., 106 N.M. at 667, 748 P.2d at 510 ("[I]f an employer does choose to issue a policy

statement, in a manual or otherwise, and by its language or by the employer's actions, encourages

reliance thereon, the employer cannot be free to only selectively abide by it.").  Hartnett attended

managerial training at Managing Within the Law five times; at the workshops  Papa John's human

resources department trained him in a number of procedures, and he received a participant's guide.

See Response ¶¶ 7-10, at 2.  Although Hartnett characterizes Managing Within the Law as a

workshop where he was "formally trained by [Papa John's] on its company policy regarding

employee discipline," Smith, Papa John's current director of human resources, testified that

Managing Within the Law is not a workshop where company policy is espoused.  Response ¶ 7, at

2.  See Smith Dep. at 66:23-24.  The Training Guide does not refer to the guidelines contained

therein as "company policy."  Training Guide at 2-32.

       The Training Guide, and the sections excerpted from the Participant's Guide, refers to some

procedures as "Guidelines," Training Guide at 5, "Suggested Form of Corrective Action," Training

Guide at 12, and "Characteristics of Good Documentation," Training Guide at 16.  These terms are

equivocal, and could lead to a conclusion that materials and information provided at Managing

Within the Law were "of a non-promissory nature and merely a declaration" of Papa John's "general

approach to the subject matter discussed," and not sufficient to create an implied contract modifying

Hartnett's at-will employment.  Sanchez v. The New Mexican, 106 N.M. at 79, 738 P.2d at 1324

(finding that an employee's manual was too general and lacked the specificity required to create an

implied contract for employment).  On the other hand, materials from Managing Within the Law

direct attendees to "follow these guidelines," referring to the Due Process Guidelines, Training

Guide at 7, and inform attendees that the actions -- not guidelines -- to be taken before separating

an employee for a policy violation "must be followed," Training Guide at 25.  These statements are more similar to those in Newberry v. Allied Stores, Inc., where the employee was told during his management training that he "had to follow" the company policy in the policy manual.  108 N.M. at 428, 773 P.2d at 1235.  Although Managing Within the Law does not refer to its procedures as "established procedure," the Training Guide directs speakers to inform participants that they must follow the procedures outlined for termination.  Cf. Lukoski v. Sandia Mgmt. Co., 106 N.M. at 666, 748 P.2d at 509 (finding that a manual that referred to its policies as "established procedures regarding suspension of problem employees and termination for those who cannot conform to the Company Policy," sufficient to modify an oral employment agreement).  Managing Within the Law contains procedures to be followed before terminating an employee for a policy violation, and directs managers that the procedures "must" be followed, Training Guide at 15, all the more specific than the handbook in Lukoski v. Sandia Indian Mgmt. Co., which the Supreme Court of New Mexico found to have amended an oral agreement for one-year of employment, notwithstanding the "language of the termination policy [being] ambiguous and contain[ing] no required policy for termination," 106 N.M. at 666, 748 P.2d at 509.

The Supreme Court of New Mexico held that "[a] personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlines," and found that a policy manual given to an employee at his managerial training created an implied contract.  Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234.  Just like the handbook at issue in Lukoski v. Sandia Indian Mgmt. Co., nothing in the materials submitted to the Court from Managing Within the Law "alert[s] an employee against placing reliance on any statement contained therein or against viewing such discipline and termination policy as only a unilateral expression of [Papa John's] intention that is

subject to revocation at any time."  106 N.M. at 666, 748 P.2d at 509.  Unlike the Team Member Handbook, Managing Within the Law, which Hartnett attended five times, does not refer to Hartnett's employment status with Papa John's, either to affirm his at-will status or to disclaim the possibility that Managing Within the Law modifies the terms of Hartnett's employment.  Just as the policy manual in <u>Newberry v. Allied Stores, Inc.</u> contained provisions on a variety of matters, including personnel issues, rules and regulation, and a section on involuntary termination, and was determined to have "controlled the employee-employer relationship," Managing Within the Law discussed a variety of matters, albeit within the scope of discipline and termination practices, and could be found to control the employee-employer relationship regarding discipline and termination. <u>See</u> 108 N.M. at 428, 773 P.2d at 1235.

 Unlike other cases, however, Hartnett entered into an express agreement for his employment to be at will before attending Managing Within the Law.  <u>See</u> <u>Newberry v. Allied Stores, Inc.</u>, 108 N.M. at 427, 773 P.2d at 1233 (finding that a policy manual created an implied contract that the procedures therein would be followed when an employee did not have an express agreement for employment); <u>Garcia v. Middle Rio Grande Conservancy</u>, 121 N.M. at 730-31, 918 P.2d at 10-11 (finding that a personnel policy modified an oral employment agreement, where the oral agreement did not expressly provide for employment to be at will or term).  On the other hand, Hartnett's Management Agreement did not expressly disclaim the possibility of an oral modification, as did employment application in <u>Sullivan v. Am. Online, Inc.</u>  See 219 F.App'x at 722.  Yet, Managing Within the Law could be similar to the training Sullivan received in employee discipline, that related to her duties disciplining subordinate employees, but not to herself and her employment relationship with America Online.  <u>See</u> <u>Sullivan v. Am. Online, Inc.</u>, 219 F.App'x at 723 n. 1 (finding that statements made to Sullivan "in the context of addressing how she, in her later position as a coach,

should discipline consultants," were not sufficient to modify her employment-at-will status with America Online).  Managing Within the Law is not the last piece of evidence the Court has to consider.

### 4.      **Hartnett's Experience Working with Papa John's**.

Hartnett relies on his understanding of the "general" practice of human resources officers in support of his assertion that an implied contract modified his at-will status.  <u>See</u> Response ¶¶ 23-33, at 5-6.  New Mexico courts have been wary, however, of finding an implied contract to terminate only for cause was created by an employer's practice of only terminating for cause alone.  As the Supreme Court of New Mexico explained in <u>Hartbarger v. Frank Paxton, Co.</u>, "this Court will not consider evidence that a company does not usually fire employees without a good reason as by itself establishing that the company does not maintain an at will policy."  115 N.M. at 664, 857 P.2d at 785.  On the other hand, one of the "[a]ctions to take before separating team members from the company for policy violations" is that participants are to "[e]nsure you are being consistent with other similar situations." Training Guide at 25.  Thus, if Papa John's issued a policy statement that it would abide by certain procedures before terminating an employee, and those procedures were published to employees through Managing Within the Law, whether Hartnett was treated consistently with other employees, as evidenced by Papa John's company practice, would be relevant in determining whether Papa John's breached a promise that it would ensure consistent treatment when in terminating an employee.  Thus, in light of the Supreme Court of New Mexico's admonition that a practice of terminating employees only for cause is not sufficient on its own to create an implied contract that employees may only be terminated for cause, Hartnett's reliance on his experience working with the human resources department does not aid his claim for an implied contract.  On the other hand, if the totality of Hartnett's relationship with Papa John's does create

a reasonable expectation that Papa John's would abide by certain procedures in terminating Hartnett, and if one of those procedures was a promise that Hartnett would be treated similarly to employees in other situations, then Papa John's regular practice in dealing with discipline and termination would be relevant.

### 5.   The Memorandum From Rick Woods.

Rick Woods, Papa John's Operations Vice President, sent on February 15, 2005, a memorandum to all "Star Papa Directors of Operations." See Woods Memo. at 1, 3.  The Court sees no reason, on the whole record before the Court, why Hartnett would not have received and read this memorandum, as he was promoted to a Director of Operations in 2003.  See Hartnett Dep. at 62:20-22.  Rick Thompson signed the Woods Memo. as the "Director of Operations," and he investigated and approved the termination of Hartnett.  Woods Memo. at 3; Incident Report at 1-2.  This memorandum is more specific than Managing Within the Law, in that the Woods Memo. states that it is an "official communication on procedures for handling . . . terminations . . . of all management team members. . . . [and] all policies listed herein take effect immediately."  Woods Memo. ¶ 1, at 1.  The "Terminations" section contains three sub-headings, each of which states that the procedure defined therein "must be" followed.  Woods Memo. ¶ 3.  The third paragraph provides that "[a]ll pertinent company policies must be followed during the termination process."  Woods Memo. ¶ 3(c).[19]

---

[19]The Court reasonably must infer that Hartnett received and read the Woods Memo. while employed with Papa John's.  Because the Woods Memo. provides mandatory language and specific procedures that correlates with Hartnett's training from Managing Within the Law, and Braafhart's statements regarding company policy, the Woods Memo. is the most important piece of evidence in Hartnett's claim that an implied contract existed.

As the Tenth Circuit has noted, "New Mexico courts have treated reliance as an important factor in determining whether an implied contract exists." Bayliss v. Contel Federal Sys. , Inc., 2011 WL 47111, at *5.  The Supreme Court of New Mexico has stated that an implied contract can be

Like the policy manual distributed to the employee during his managerial training in
Newberry v. Allied Stores, Inc., which the employee was told he "had to follow," the Woods Memo.
was distributed to all "Star Papa" directors of operations and informed them that they must follow
the procedures outlined therein.  108 N.M. at 428, 773 P.2d at 1235.  Additionally, the Woods
Memo. does not limit its application to termination and discipline alone, as Managing Within the
Law did, but rather the "policies" in the Woods Memo. cover procedures for "demotions,
terminations, promotions, selection, and hiring of all management team members."  Woods Memo.
¶ 1.  Each section contains specific procedures that must be followed before the particular action
may take place.  See Woods Memo. ¶¶ 2-7, at 1-3.  These delineated procedures are not ambiguous,
and are required by Hartnett's supervising managers, and thus are more specific than the manual
distributed in Lukoski v. Sandia Indian Mgmt. Co. that the Supreme Court of New Mexico
nonetheless found to establish procedures regarding suspension and termination.  See 106 N.M. at
666, 748 P.2d at 509.  The procedures are specific enough to proscribe the pay-grades that would
apply if a manager is demoted, see Woods Memo. ¶ 6(b), at 2, as well as the schedules that Directors
of Operations should follow each week, Woods Memo. ¶ 7(b), at 2.  A jury could reasonably find

---

created by an employer, by its actions or languages, issues policy statements and "encourages
reliance thereon."  Lukoski v. Sandia Indian Mgmt. Co., 110 N.M. at 667, 748 P.2d at 510.  The
Court's ruling today is based on the inference it must make in favor of Hartnett on a motion for
summary judgment.  See Hunt v. Cromartie, 526 U.S. at 550-55 (on a summary judgment motion,
all reasonable inferences must be construed in favor of the non-moving party).  If Hartnett did not
receive or read the Woods Memo., or did not rely upon the Woods Memo. as part of his belief that
an implied contract existed, the Court would be inclined to grant a directed verdict in favor of Papa
John's.  Similarly, if the Woods Memo. did not apply to Hartnett, then the Woods Memo. could not
form a connection between Managing Within the Law and Braafhart's statements, and the Court
would likely grant a directed verdict in favor of Papa John's.  See, e.g., Paca v. K-Mart Corp., 108
N.M. 479, 480-81 775 P.2d 245, 246-47 (1989)(finding that an employee could not rely on an
employee handbook that was not given to him and did not apply to him as the basis for an implied
contract modifying his employment relationship).

that this memorandum is of a "non-promissory nature" and not "merely a declaration of [Papa John's] general approach to the subject matter discussed," by the specificity with which required procedures are described.  Sanchez v. The New Mexican, 106 N.M. at 79, 738 P.2d at 1324 (finding that a manual of a non-promissory nature that merely declared the employer's general approach to a subject matter could not rise to the level of specificity necessary to create an implied contract).

The Woods Memo., thus, could be found to control Hartnett's relationship with Papa John's, not only because of the mandatory language contained therein, but also because the Woods Memo. relates to a wide range of employment matters: the memorandum proscribes specific procedures for Hartnett to follow while executing his duties, and the Court can reasonably infer one of Hartnett's supervisors sent it to him.  Further, unlike Managing Within the Law, that could have been construed as training for Hartnett to apply, rather than training that applied to him, the Woods Memo. outlines procedures to be used for all "management team members."  Woods Memo. ¶ 1, at 1.  Just as the manual in Lukoski v. Sandia Indian Mgmt. Co. did "nothing to alert an employee against placing reliance on any statement contained therein or against viewing such discipline and termination policy" as modification of the employee's at-will status, the Woods Memo. does nothing to alert Director of Operations that they should not rely on the procedures outline therein.  106 N.M. at 666, 748 P.2d at 509.

Although the parties have not alleged that Hartnett was still a "management team member" when terminated in 2007, because he had been promoted to a Director of Operations in 2003, Papa John's has argued that Hartnett's Management Agreement still applied to Hartnett's employment status when he was terminated.  See Hartnett Dep. 62:20-23; Papa John's Reply at 3-4 (arguing that the Management Agreement established Hartnett's employment to be at will, and that the terms of the agreement were not altered).  Further, as the Court must draws all reasonable inferences in

Hartnett's favor, in the absence of facts to the contrary, the Court will infer that the Woods Memo. established procedures that applied to Hartnett's employment.  Given this inference, the Woods Memo. is unlike the training the employee received in <u>Sullivan v. Am. Online, Inc.</u> that did not apply to her specifically and thus could not form the basis of an implied contract.  <u>See</u> 219 F.App'x at 723.  Further, the Woods Memo. is not discretionary, as was the training in <u>Sullivan v. Am. Online, Inc.</u>  <u>See</u> 219 F.App'x at 723.  Rather, the Woods Memo., in its definitive and mandatory language, requiring that Directors of Operations must use certain procedure and policies when terminating salaried managerial members, that does not disclaim that it modifies Hartnett's at-will status, may be reasonably sufficient to encourage Hartnett's reliance thereon for establishing procedures that would be followed before his termination.

**B.      UNDER A TOTALITY OF THE CIRCUMSTANCES, A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER PAPA JOHN'S ENTERED INTO AN IMPLIED CONTRACT TO TERMINATE HARTNETT ONLY FOR CAUSE, <u>AND AFTER FOLLOWING CERTAIN PROCEDURES.</u>**

The Court must weigh all of the evidence before it, not only the Management Agreement, and determine if "a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons."  <u>Gerald v. Locksley</u>, 785 F.Supp. 2d at 1108-09.  The Court looks to the totality of Hartnett's relationship with Papa John's to determine whether an implied contract modifiying Hartnett's at-will employment status was created.  <u>See</u> <u>Hartbarger v. Frank Paxton, Co.</u>, 115 N.M. at 674-675, 857 P.2d at 785-786.  The Court concludes that a reasonable jury could find that an implied contract existed under which Papa John's would follow certain procedures in terminating an employee, and a reasonable jury could find that an implied contract to terminate Hartnett only for cause existed.

The Court is presented with a number of pieces of evidence that could support either parties'

argument regarding the existence of an implied contract. First of all, Hartnett has an express

Management Agreement with Papa John's that provides for employment to be at will, a piece of

evidence that sets this case apart from many in which New Mexico courts have found an implied

contract to exist. On one hand, the Management Agreement is an express contract, which purports

to control the employment relationship, as did the employment contract in McGinnis v. Honeywell.

See 110 N.M. at 4, 791 P.2d at 455 ("[W]e are struck by the fact that the parties at trial by and large

confined themselves to a dispute about whether or not an implied contract of employment existed,

without addressing the point, which strikes us as fairly obvious, that there was an express

contract."). Unlike the contract in McGinnis v. Honeywell, Hartnett's at-will status is not

conditioned, by the terms of the Management Agreement, upon Papa John's adherence to any

particular policy or procedure. See McGinnis v. Honeywell, 110 N.M. at 4, 791 P.2d at 455 (noting

that an express contract included the terms of personnel policies and practices published to

employees, and thus the employee's at-will employment could only be terminated in accordance

with those policies). Hartnett's Management Agreement does not, however, expressly disclaim the

possibility of any modification by oral representations, as did the application for employment in

Sullivan v. Am. Online, Inc. and Cory v. Allstate Ins. See Sullivan v. Am. Online, Inc., 219

F.App'x at 721-22 (holding that Sullivan's reliance on oral statements as modifying her at-will

status was misplaced, because her application for employment expressly disclaimed the possibility

of any modification, unless done in writing by an officer or official of America Online); Corey v.

Allstate Ins., 583 F.3d at 1241, 1245 (stating that oral representations could not reasonably be

believed to modify an express contract that disclaimed the possibility of modification by oral

representations).

-70-

Although Hartnett's Management Agreement and the Team Member Handbook affirm Hartnett's at-will status, his training from Managing Within the Law, in conjunction with Braafhart's statements and the Woods Memo. could support a belief that Papa John's established a procedure that would be followed in terminating Hartnett's employment. Unlike the four separate documents in <u>Sullivan v. Am. Online, Inc.</u>, all of which expressly disclaimed any modification to the employee's at-will status, only two of the documents given to Hartnett expressly disclaim a modification to his at-will status, and he signed only one in receipt and acknowledgment -- the Management Agreement.  Further, the Management Agreement does not disclaim the possibility of a modification, either in writing or through oral representations.

The Woods Memo. is a direct, written communication from a supervisor who had the power to terminate Hartnett, and the memorandum requires certain procedures to be followed prior to a termination.  By the limited facts before the Court, the Woods Memo. applied to Hartnett and could reasonably be found to have established  procedures regarding Hartnett's termination.  The Woods Memo. requires only three procedures before terminating an employee, and not all three of the procedures are equally specific.  The procedures required are: (i) communication of the termination to the OVP and PSD before terminating the employee; (ii) implementing a documented coaching and action plan to correct a performance issue prior to termination; and (iii) following all pertinent company policies in the termination process.   Under a totality of the circumstances, these procedures, published to Hartnett in 2005, could objectively be viewed as confirmation of the training Hartnett received at Managing Within the Law, beginning in 2002 and on four subsequent occasions.  The "pertinent company policies" to which the Woods Memo. refers could be viewed as requiring Directors of Operations to following their training from Managing Within the Law, as Hartnett asserted he was taught "company policy" at those workshops.

The Court is thus not persuaded that there is no genuine issue of material fact regarding whether Papa John's and Hartnett had an implied contract to follow certain procedures in terminating Hartnett, and to terminate him only for cause.  Although the existence of an express contract providing for at-will employment is strong evidence, the Management Agreement did not disclaim the possibility of modification either in writing or by oral representations, as did the employment application in Sullivan v. Am. Online, Inc.  See 219 F.App'x at 729.  The Team Member Handbook likewise states that Papa John's employees are at will, but a disclaimer is not dispositive, and the Court must look at all of Papa John's words and conduct.  See Zaccardi v. Zale Corp., 857 F.2d at 1476 (noting that a disclaimer does not dispositively determine an employee's employment status).  Hartnett was required to attend five separate management workshops, where he was told that procedures "must" be followed before terminating an employee for a policy violation.  Training Guide at 25.  The Court can reasonably infer from the written record before the Court that the supervisor who controlled Hartnett's employment distributed to him the Woods Memo., which contained mandatory language requiring certain procedures to be followed and stated that "pertinent company policies must be followed in the termination process."  Woods Memo. ¶ 3(c).  In conjunction with Hartnett's repeated managerial training at Managing Within the Law, the Woods Memo. could reasonably be believed to establish procedures that controlled Hartnett's employment.  An employer cannot "issue a policy statement, in a manual or otherwise, and by its language or by the employer's actions, encourage reliance thereon . . . [and] only selectively abide by it."  Lukoski v. Sandia Indian Mgmt., 106 N.M. at 667, 748 P.2d at 510.

Braafhart's statements, upon which Hartnett relies for his contention that an implied contract providing for his termination to be for cause only was established, are more ambiguous.  By referring to company policies, these statements could be consistent with Hartnett's training from

Managing Within the Law, and the procedures outlined in the Woods Memo., which told him that procedures and company policies must be followed in a termination. Braafhart's statements were not specific, but were made in the context of Hartnett executing the CNC Agreement with Papa John's. Hartnett stated that he wanted more time to sign the CNC Agreement, but Braafhart assured him that this was not necessary. See Response ¶ 4, at 2. Hartnett states that he signed the CNC Agreement "[b]ecause of Braafhart's statement." Response ¶ 6, at 2. These statements are not made in an informal context, as were the statements in Hartbarger v. Frank Paxton, Co., that did not give rise to an implied employment contract. See 115 N.M. at 664, 857 P.2d at 785. Because the statements were made while Hartnett considered whether to execute an agreement with Papa John's, the statements are similar to those in Kestenbaum v. Pennzoil, Co., 108 N.M. at 25, 766 P.2d at 285, which were made as part of a bargained-for exchange, and, in the context of other evidence, gave rise to contractual obligations. In light of the other evidence, Braafhart's statements may fit within a reasonable belief that Papa John's had limited its ability to terminate employees. Although Hartnett's Management Agreement expressly provided that his employment would be at will, he also attended five Managing Within the Law workshops, and, apparently, received and read the Woods Memo. before his termination. Both the Training Guide and the Woods Memo. provide specific procedures that should be followed before terminating an employee. It would not seem logical for an employer to retain the ability to terminate an employee for no cause, when at the same time mandating that termination is not being done "because of personal dislike or discriminatory factors," Training Guide at 6, and requiring the Operations Vice President and human resources department to be notified prior to terminating an employee, Woods Memo. ¶ 3(a), at 1. A reasonable jury could find that there is no need, or diminished need, for such procedures if Papa John's retained the ability to terminate employees at will, without cause. Thus, in light of the totality of Hartnett's relationship

with Papa John's, Braafhart's statements may be consistent with Papa John's other words and conduct that limited Papa John's ability to terminate employees without cause and without following certain procedures. Braafhart's statements, at a minimum, do not contradict such a finding.

To the extent that Braafhart's statements purport to limit Papa John's ability to terminate employees to only situations where the employee was not performing, or was violating policies or procedures, however, the statements are in isolation, and the totality of Hartnett's relationship with Papa John's do not support such a contention. See Response ¶ 5, at 2. No other evidence contains such a specific disclaimer of Papa John's ability to terminate an employee. The Training Guide does not delineate exclusive reasons for which Papa John's may terminate an employee; rather, the Training Guide states that the two "primary" reasons are for policy violations and under performance. Training Guide at 25. Furthermore, the Team Member Handbook provides a "partial list" of infractions that may result in a team members' separation from Papa John's, and includes many infractions that Braafhart did not mention to Hartnett. Team Member Handbook at 4 (Doc. 101-9). Nor does the Woods Memo. refer to any acceptable or unacceptable reasons for terminating an employee or initiating the termination process. Braafhart's statements, thus, does not support a finding that Papa John's limited its ability to terminate employees to only situations of under performance or violations of company policy or procedures.

Under a totality of the circumstances, Papa John's has thus not shown that there is no evidence to support Hartnett's claim that an implied contract existed. See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891 (holding that, on a motion for summary judgment, the movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."). A reasonable jury could conclude by a totality of Papa John's words and conduct, including Managing Within the Law, Braafart's statements, and the Woods Memo., that Papa John's

had communicated to Hartnett that he could reasonably rely on certain procedures being followed during his termination, in modification of his expressly at-will employment.  While Braafhart's statements alone are not sufficient to support an objectively reasonable belief that Papa John's agreed to only terminate employees for certain specified reasons, in light of the totality of Hartnett's relationship with Papa John's, a reasonable jury could find that Papa John's had modified Hartnett's at-will status and limited Papa John's right to terminate employees to situations where cause justified the termination.  Thus, a genuine issue of material fact remains as to whether an implied contract to follow company policies in terminating Hartnett, and to terminate Hartnett only for cause, was created by Papa John's words and conduct.

## III.    A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER PAPA JOHN'S BREACHED AN IMPLIED CONTRACT OF EMPLOYMENT WITH HARTNETT.

The Court finds that Papa John's has not met its burden on this motion for summary judgment.  Evidence remains that supports Hartnett's claim for a breach of an implied covenant to follow certain procedures in terminating him.  Although the Court is not establishing the terms of any implied contract between Hartnett and Papa John's, the Court construes all inferences Hartnett's favor, in light of the Court's determination that a genuine issue of material fact exists whether Papa John's implicitly agreed to abide by company policies in terminating Hartnett.  See Hunt v. Cromartie, 526 U.S. at 550-55 (on a summary judgment motion, all reasonable inferences must be construed in favor of the non-moving party).

### A.    A GENUINE ISSUE OF MATERIAL FACT IS PRESENT WHETHER PAPA JOHN'S COMPLIED WITH ITS AGREEMENT TO TERMINATE HARTNETT FOR CAUSE.

Papa John's contends that it had reasonable belief sufficient to warrant terminating Hartnett.  See MSJ at 8-10.  Papa John's contends that Hartnett knew that falsifying mileage reports could lead

-75-

to termination and that Papa John's determined Hartnett had falsified mileage reports.  See MSJ at 8-10.  Hartnett's dispute regarding the reasonableness of Papa John's belief is based on his contention that Papa John's failed to follow the proper procedures in investigating Hartnett and that Papa John's did not apply the correct standard in determining whether terminating Hartnett was warranted.  See Response ¶¶ 44-78, at 7-10; id. at 15.  Hartnett contends that Papa John's investigation was flawed.  See Response ¶¶ 44-78, at 7-10.  Hartnett argues that proper procedures would include a more thorough investigation, including gathering first-hand statements from witnesses, and required Thompson to visit all of the stores that were listed on Hartnett's mileage report to confirm his attendance.  See Response ¶¶ 47-48, at 7; id. ¶ 64, at 9.  Additionally, Jackson admitted that the statements taken from one of the stores in the investigation were faulty and unusable.  See Response ¶ 65, at 9 (citing Jackson Dep. at 216:11-13).  Jackson also informed other human resources employees that she had obtained statements from all the stores, when she did had not.  See Response ¶ 67, at 9 (citing Herren Letter at 1; Montoya Letter at 1; Jackson Dep. at 107:14-16, 108:1-4).

Hartnett also contends that a genuine issue of material facts exists whether Papa John's had a reasonable belief sufficient to warrant terminating Hartnett.  See Response at 15.  Hartnett states that Papa John's did not have a defined policy regarding how to fill out mileage reimbursement and expense reports, and Hartnett states that different managers have been trained in different methods of filling out the forms.  See Response ¶¶ 34-35, at 6.  Hartnett also contends that the reasonableness of his termination is a question for a jury to decide, as "there are multiple issues which raise an issue of whether or not a reasonable man would have terminated Mr. Hartnett."  Response at 15.

Argument was made at the hearing regarding the correct standard for the Court to use in determining whether Papa John's breached an implied contract.  Papa John's asserted that it did not

breach an implied contract, so long as Papa John's "reasonably believe[d] that there was a falsification [of] the expense report," and that the reasonableness of the procedures used in deciding to terminate Hartnett were not at issue.  Tr. at 13:16-21 (Prynkiewicz).  On the other hand, Hartnett argues that the correct standard to use is a two-prong test, requiring that the discharge was reasonable and that the employer had sufficient cause.  See Tr. at 16:9-11.  Both parties referred at the hearing to  N.M.R.A., Civ UJI 13-2306, New Mexico's uniform jury instruction for "Cause Justifying Discharge."  Tr. at 14:10-25 (Prynkiewicz); id. at 16:9-11 (Fogel).

The Court must determine whether Papa John's subjective belief that it had sufficient cause to terminate Hartnett was, as a matter of law, objectively reasonable.  See Kestenbaum v. Pennzoil, Co., 108 N.M. at 207, 766 P.2d at 287; N.M.R.A. Civ. UJI 13-2302 cmt. Although Papa John's asserts that it conducted an investigation into the allegedly falsified mileage reports, Papa John's does not contest Hartnett's statement that employees were trained in different methods for filling out the mileage reports.  Inconsistent procedures would tend to show that there was not an established policy that Papa John's could determine was clearly violated, as there was in Newberry v. Allied Stores, Inc.  See 108 N.M. at 428, 773 P.2d at 1235 (finding that all employees, managerial and hourly alike, knew and understood a policy violated by an employee who was then terminated for cause, in accordance with the employee's implied contract).  Additionally, Hartnett challenges the procedures that Papa John's used in attaining evidence while investigating Hartnett, and Hartnett argues that Papa John's may not have relied upon evidence that was obtained first-hand.  Jackson's admission that some of the statements were unusable and that not all of the relevant stores were visited during the investigation suggests support for Hartnett's challenge.  Similarly, in Kestenbaum v. Pennzoil, Co., the Supreme Court of New Mexico found that an investigation which did not "evaluate the credibility of the persons interviewed," and did not differentiate between first-hand

knowledge and other forms of information, was insufficient to support a reasonable belief that good cause for terminating an employee existed.  See 108 N.M. at 28, 766 P.2d at 288.  Although Papa John's investigation does not seem to rely on hearsay, gossip or rumor, that statements were not obtained first-hand and that not all of the stores on Hartnett's mileage report were visited weighs against a finding that Papa John's had an objectively reasonable belief that sufficient cause existed to terminate Hartnett.  The Court cannot thus rule that no genuine issue of material fact exists, as evidence does support Hartnett's claim that Papa John's lacked a reasonable belief that sufficient cause existed to terminate Hartnett.

**B.    A GENUINE ISSUE OF MATERIAL FACT IS PRESENT WHETHER PAPA JOHN'S BREACHED AN IMPLIED CONTRACT TO FOLLOW CERTAIN PROCEDURES IN TERMINATING HARTNETT.**

Papa John's contends that, even if an implied contract existed, Papa John's was justified under New Mexico law in terminating Hartnett.  See MSJ at 8-9 (citing N.M.R.A., UJI 13-2306 (2012)).  Papa John's argues that Hartnett was terminated for having falsified company documents -- specifically, the mileage on an expense report Hartnett submitted for September expenses.  See MSJ at 9.  Papa John's asserts that Hartnett committed a policy violation by falsifying a mileage report, an offense that Hartnett knew could result in his termination.  See MSJ at 6, 9.  Papa John's argues that Hartnett's supervisor, Thompson, investigated Hartnett's expense reports in conjunction with Jackson of Papa John's human resoruces department.  See MSJ at 9.  Papa John's asserts that Jackson's Incident Report on Hartnett concluded that Hartnett had falsified the mileage on his September expense report.  See MSJ at 9-10.

Hartnett argues that Papa John's breached an implied agreement to follow particular procedures in discharging Hartnett.  See Response at 13.  Hartnett asserts that the Managing Within the Law workshops form the basis of an implied contract that an investigator would take statements

from team members directly, following an interview, when investigating a supposed infraction --

an understanding that Hartnett asserts Jackson's statements supports.  See Response at 13-14

(quoting Jackson Dep. at 66:21-25, 67:1-8 ("[I]n taking statements, . . . we question and talk to the

employee and get information in a conversation and then ask them to summarize what they just told

us and put it in a written statement that they sign and date.")).  Hartnett also contends, based on

Managing Within the Law, that any investigation would be conducted in confidence, a term of the

alleged agreement that Hartnett argues was broken when Thompson told Trujillo that Hartnett could

be terminated as a result of Thompson's investigation, and by terminating Hartnett at a Wendy's

restaurant.  See Response at 14-15.

        A genuine issue of material fact is present whether Papa John's entered into an implied

contract to abide by company policies and procedures in terminating Hartnett.  Hartnett contends

that he understood, from Managing Within the Law, that he would only be terminated after being

given an opportunity to respond to allegations against him.  See Response at 7.  Hartnett contends

that a thorough investigation should have been completed before his termination.  See Response at

14.  Hartnett was not interviewed prior to his termination.  See Thompson Dep. at 93:7-25.

Although the Training Guide does not explicitly state that an employee must be given an interview,

the Due Process section states that part of the guideline to "Act Fairly" includes "Determine if the

team member knew and understood the penalties for the rule violation."  Training Guide at 2.

Additionally, in the section regarding "Actions to take before separating team members from the

company for policy violations," under "Gather the facts," the participants were instructed to

"Determine if the team member knew of the policy violation."  Training Guide at 25.  Papa John's

does not dispute that Hartnett was terminated for violating a company policy.  Yet, the Incident

Report does not state that Thompson or Jackson made efforts to determine whether Hartnett

understood his violation prior to terminating Hartnett.  Incident Report at 1-2.  The Incident Report states that Thompson sent Hartnett an email about his mileage reports several months before the investigation commenced, but there is no other evidence that Papa John's attempted to "investigate extenuating circumstances," or otherwise to determine Hartnett's situation and understanding regarding the violation.  Training Guide at 25.  Papa John's contends that Jackson and Thompson conducted an investigation, which included obtaining statements from the employees at the stores Hartnett allegedly did not visit.  See MSJ at 9-10.  Hartnett challenges the adequacy of these statements.  See Response at 14.  Whether Papa John's investigation was sufficient to meet the standards proscribed by Managing Within the Law cannot be determined by these facts, because Papa John's does not allege that it attempted to confer with Hartnett before his termination, or otherwise investigate into extenuating circumstances or to confirm that Hartnett understood the policy violation.  Hartnett contends that he did not understand the violation, as different managers were trained in different methods of filling out the mileage reports.  Thus, by not interviewing Hartnett before terminating him, a genuine issue of material fact is present whether Papa John's breached its implied contract to follow particular procedures before terminating Hartnett, if such an implied contract existed.

Hartnett also alleges that Papa John's violated company policy regarding privacy by conducting the separation meeting at a Wendy's restaurant and communicating his impending termination to Trujillo.  See Response ¶¶ 60, 74, at 8-10; id. at 14.  The Training Guide provides that a separation meeting should be held "promptly and privately."  Training Guide at 27.  The Training Guide does not provide further discussion regarding holding the meeting "privately."  Training Guide at 27-28.  Although this term is not clear, that Hartnett was terminated at a public restaurant, and not at a place that some reasonable juries may be deem to be "private," suggests,

although not strongly, that a genuine issue of material fact exists because Papa John's choose to terminate Hartnett at a Wendy's restaurant.  While this fact alone might not suggest denial of the motion, it shows that Papa John's was not happy to follow any policies.  Additionally, communicating Hartnett's impending termination to Trujillo could be a breach of a confidentiality requirement taught at Managing Within the Law.

If an implied contract were created, Papa John's has not shown that no evidence supports Hartnett's contention that Papa John's breached that contract.  Although the Court is not defining the terms of any implied contract between Papa John's and Hartnett, the Court notes that some of Papa John's actions could be construed as inconsistent with procedures published through the Managing Within the Law workshops.  The Court cannot, thus, rule as a matter of law that Papa John's is entitled to summary judgment in its favor.

The Court finds that genuine issues of material fact are present regarding the reasonableness of Papa John's belief that it had sufficient cause to terminate Hartnett.  While Papa John's may have subjectively believed that it had sufficient cause to terminate Hartnett, a jury may find that Papa John's belief was not objectively reasonable.  Papa John's relied on an investigation that included second-hand statements, where not every relevant store was visited, and Hartnett was terminated for a policy violation that may have been unclear because employees were trained in multiple methods of filling out mileage reports.  Additionally, if an implied contract to follow procedures existed, Papa John's may have breached that contract by not interviewing Hartnett before his termination, not conducting the proper type of investigation, and terminating Hartnett at a public restaurant.  The Court thus, does not find that Papa John's is entitled to a judgment as a matter of law that it did not breach an implied contract with Hartnett.

Furthermore, a genuine issue of material fact exists as to whether Papa John's entered into

an implied contract to terminate Hartnett only for cause, and to only terminate him after following

certain procedures.  The totality of Hartnett's employment relationship with Papa John's could

reasonably lead Hartnett to believe that the policies and procedures presented in Managing Within

the Law, in conjunction with the mandatory terms of the Woods Memo., limited Papa John's ability

to terminate Hartnett without following certain procedures.  Additionally, Braafhart's statements to

Hartnett regarding Hartnett's future with Papa John's, in conjunction with the Training Guide and

the Woods Memo. that required investigation before termination, could be found by a reasonable

jury as communication by Papa John's that Hartnett would be terminated only for cause.  The Court

thus, does not find that Papa John's is entitled to judgement as a matter of law.

      **IT IS ORDERED** that Defendant Papa John's Motion for Summary Judgment Re:

Plaintiff's Breach of Contract Claim, filed August 29, 2012 (Doc. 92), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Patrick L. Fogel
The Fogel Law Firm
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Donald Jay Summer
Charlotte A. Lamont
Littler Mendelson P.C.
Albuquerque, New Mexico

    -- and --

Peter Prynkiewicz
J. Mark Ogden
Littler Mendelson, P.C.
Phoenix, Arizona

*Attorneys for the Defendant*